UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA              Crim. No. 3:24CR108(SRU)

v.

KONSTANTINOS DIAMANTIS              September 26, 2025

## GOVERNMENT'S TRIAL MEMORANDUM

The Government submits this trial memorandum to summarize its anticipated case-in-chief and alert the Court to potential evidentiary issues, understanding that the parties are still working diligently to resolve any disagreements.

## I.    Procedural Background and Anticipated Trial Length

On May 15, 2024, a grand jury in New Haven returned a 22-count indictment charging the defendant Konstantinos Diamantis, also known as "Kosta," with two counts of Hobbs Act extortion under 18 U.S.C. § 1951 (Counts One and Two), two counts of bribery under 18 U.S.C. § 666(a)(1)(B) (Counts Three and Four), two counts of conspiracy to commit Hobbs Act extortion under 18 U.S.C. § 1951 (Counts Five and Six), two counts of conspiracy to commit bribery under 18 U.S.C. § 371 (Counts Seven and Eight), and fourteen counts of making false statements to law enforcement agents under 18 U.S.C. § 1001(a)(2) (Counts Nine through Twenty-Two).  Indictment [Dkt. #1].

Jury selection is scheduled for October 3, 2025, with evidence to begin thereafter.  Building in reasonable time for cross examination, the Government currently estimates that its case-in-chief will last at least eight trial days.

## II.    Evidence to be Presented at Trial

The Government has charged that, between 2018 and 2021, Diamantis used his position as head of the State of Connecticut's Office of School Construction Grants and Review ("OSCGR")

to corruptly solicit, demand, and accept bribes from contractors working on State-funded school construction projects.  The Government has also charged that, in 2023, Diamantis tried to conceal that prior criminal conduct by making false statements to the Federal Bureau of Investigation ("FBI").

As summarized below, this evidence will prove the charges against Diamantis beyond a reasonable doubt.

### A.    Background on State-Funded School Construction Projects

From May 2015 through October 2021, Diamantis was employed by the State of Connecticut as the director of OSCGR.  Most school construction in Connecticut is partially funded by the State in the form of grants administered by OSCGR.  Some of these projects cost tens, if not hundreds, of millions of dollars.  Diamantis's colleagues and construction professionals witnessed him take a very personal and hands-on approach to overseeing construction projects. Diamantis, as OSCGR's director, had (or claimed to have) influence over what percentage of a school construction project would be funded by the State, what decisions were made on a project, which alterations to project plans were acceptable, and which subcontractors were retained or replaced.

The Government will call Michelle Dixon, a manager at OSCGR who will offer both fact and expert testimony concerning the operation of the State grant process and Diamantis's role in it.  Towns and cities often delegated decision-making authority a school construction to a local government employee, its board of education, or a school building committee.  That project "owner" retained an architect to design the project to its specifications and budget, and a construction manager or general contractor to undertake construction or to select and supervise subcontractors.  The owner often hired a firm to supervise the project, help hire a construction manager, general contractor, or subcontractors, report back to the owner, and prepare and submit

required paperwork to the State in order to receive grant funds; if the municipality had multiple projects underway, it typically hired a large firm as its program manager; otherwise, it might hire a smaller firm called a construction administrator or owner's representative.

### B.     The Acranom Scheme and Conspiracy

From 2018 until 2021, Diamantis committed and conspired to commit extortion and bribery in connection with a masonry subcontractor named Acranom Masonry, Inc. ("Acranom").

Acranom was owned by co-conspirator Salvatore Monarca, and its vice president and principal employee was co-conspirator John F. Duffy.  Diamantis was formerly married to Duffy's sister, and the two maintained a personal relationship, referring to each other as "Uncle."  Monarca and Duffy have each pled guilty to a conspiracy to commit Hobbs Act extortion under color of official right, in violation of 18 U.S.C. § 1951, agreeing to pay Diamantis bribes so that he would take action to benefit Acranom.  *U.S. v. Monarca*, Case No. 24-cr-104-SRU, Dkt. ##2, 5; *U.S. v. Duffy*, Case No. 24-cr-105-SRU, Dkt. ##2, 5.

Diamantis induced Acranom to make payments to him in two ways.  First, Diamantis extracted payments under color of official right, that is, he solicited and accepted money in exchange for helping Acranom to obtain work on and avoid being fired from those same Hartford and Tolland projects.  Second, Diamantis used fear of economic loss, that is, when Monarca and Duffy failed to pay him as promised, he threatened to terminate Acranom from or reduce its compensation for State-funded school construction projects in Hartford and Tolland.

Acranom worked on three school construction projects that are principally relevant to the Government's case: Phase 2 of the Weaver High School project in Hartford; Phase 4 of Weaver; and the Birch Grove Primary School in Tolland.

### 1.    Weaver Phase 2

In exchange for Acranom's payments, Diamantis helped it to favorably resolve a dispute concerning its work on Phase 2 of the Weaver High School project.

The Weaver project was divided into four phases, with the second phase being construction of the classroom spaces and auditorium.  Acranom was retained in August 2017 as a masonry subcontractor for Phase 2 with a contract worth $4,090,000.  GX 100.

In March 2018, complaints arose concerning Acranom's work.  Hartford's program manager, a joint venture called Arcadis/O&G/C&R Program Management ("Arcadis"),[1] and the Weaver construction manager, Newfield + Downes Joint Venture ("Newfield"),[2] complained about the quality and timeliness of Acranom's work.  *See* GX 102.  A few months later, Acranom raised its own issue, claiming it was owed money for unanticipated expenses, such as its costs caused by delays to the masonry schedule.  *See* GX 1, 104.

In exchange for payments delivered by Monarca and Duffy, Diamantis used his State position to help Acranom in a variety of ways with respect to these disputes.  Diamantis's official actions included advocating on Acranom's behalf with Hartford officials and the Weaver project team, scheduling and attending meetings to discuss the matter, defending the quality of Acranom's work, and negotiating against the City on Acranom's behalf.  For example, in August 2019, Duffy promised the defendant that Monarca would be "finally getting on board" with payments, but that he would "want you to confirm you have his back on weaver 250,000 we are at now," understanding that the defendant "would have to let the process run" before telling the city "to resolve" the dispute. GX 32.  Indeed, in February 2020, Diamantis did instruct Newfield, Arcadis, and Hartford officials to resolve the dispute with Acranom.  *See* GX 145A, 145B.

---

[1] Identified as Program Manager-1 in the Indictment.  Indictment ¶ 5.
[2] Identified as Construction Manager-1 in the Indictment.  Indictment ¶ 6.

Diamantis then held a meeting at The Capital Grille in Hartford with Newfield's senior project manager Brian Ouelette, Arcadis's deputy director Sebastian Salafia, and Hartford city engineer Frank Dellaripa[3] to pressure them to pay Acranom.  *See* GX 146, 147.  At Diamantis's suggestion and with his approval, the City agreed to forego any additional repairs by Acranom and, on March 9, 2020, paid it an additional $300,000 to settle its claim.  GX 148.

### 2.      Weaver Phase 4

In exchange for Acranom's payments, Diamantis also helped it win the masonry contract on Phase 4 of the Weaver project, construction of the fieldhouse.

In 2018, while Acranom's Phase 2 dispute was still pending, it submitted a bid for Phase 4.  Even though Acranom was the lowest bidder, Newfield and Arcadis were opposed to giving it the contract because of its unsatisfactory work on Phase 2.  GX 3.

Monarca and Duffy again sought Diamantis's assistance, this time to pressure the Weaver project team to give Acranom the Phase 4 contract.  Diamantis explicitly agreed with Duffy to "make sure the vote … goes to [Acranom] for Phase 4." GX 8, and Duffy later commented to Monarca that they won the bid "Only for our Uncle," GX 9.  Jack Butkus (Arcadis director) wrote to the project team that, although "the quality concerns raised regarding Acranom's work to date on Phase 2 of Weaver are specific grounds to object to awarding Acranom additional work," nonetheless "those with the 'power of the purse' at OSCGR," that is Diamantis, had rebuffed an effort to award the project to the next lowest bidder.  GX 122. The Phase 4 contract was worth $3,034,000.  GX 124, 125.  Diamantis bragged about the assistance he had provided to Acranom: "It took a lot of work[.] Trust me[.] C a called me lots of calls[.]"  GX 10.

---

[3] Identified in the Indictment as City Employee-1.  Indictment ¶ 10.

Diamantis almost immediately began demanding the payments from Acranom that he had been promised. Diamantis wrote to Duffy and Monarca about his expected compensation: "Just so you both I am very good at what I do and always do what I say. Johnny knows. And I always usually work at 5 percent of total just FYI[.]" GX 11.  After his initial requests to meet were ignored by Duffy and Monarca, Diamantis complained that "I always lived in two way street I always keep my word and do what I say." GX 11. He gave them until "5 tomorrow," otherwise wished them "good luck in future endeavors." GX 11.  And, while Duffy and Monarca did pay Diamantis with Acranom funds, Diamantis still remained dissatisfied.  Duffy and Monarca lamented that Diamantis was starting to push back on their requests absent more money—Monarca wrote to Duffy that "[w]e paid him 35k. … And as of to day. We got 0," to which Duffy responded "[w]ithout him we wouldn't be at weaver 2 or got the contract Weaver 4." GX 18.

### 3.    Birch Grove

Diamantis also used rewards and threats to obtain at least $70,000 from Acranom in connection with Birch Grove Primary School.

In January 2019, Birch Grove Primary School developed cracks in its concrete foundation and was no longer safe.  Tolland School Superintendent Walter Willett wrote to Diamantis to obtain the State's authorization to waive the standard bidding process for the demolition and rebuilding project to address the emergency, which was granted.  GX 300, 301.  As Willett will testify, Diamantis pressured Tolland to hire D'Amato Construction Co., Inc. ("D'Amato")[4] as the construction manager for the Birch Grove project.

In exchange for Duffy's and Monarca's promise to pay him a kickback of at least $70,000, Diamantis helped Acranom on the Birch Grove project.  First, Diamantis caused D'Amato to invite

---

[4] Identified as Construction Manager-2 in the Indictment.  Indictment ¶ 11.

Acranom to bid on the masonry work; on April 14, 2019, Duffy forwarded to Monarca an email inviting Acranom to bid on the Birch Grove project, writing, "Uncle needs this bid tomorrow[,]" and "He has bid done[.] Has to go to gc Tuesday[.]"  GX 15.  Second, Diamantis caused D'Amato to select Acranom as a Birch Grove subcontractor; as Duffy wrote to Monarca on May 3, 2019, "Uncle no joke[.] He called me 1 hour before the GC [D'Amato] called[.] GC said very pleased to inform you we selected Acranom. [two smiley emojis.]"  GX 19.

On May 7, 2019, although the design process for the new Birch Grove was not complete, Acranom signed a $2,551,873 subcontract for Birch Grove's masonry work.  GX 303.  Duffy and Monarca did not believe that this contract was "real" yet, since the actual design and their masonry estimates were not complete.  Nonetheless, the same day that Acranom entered into the contract, Diamantis sought the promised payment from Acranom.  Diamantis, responding to Duffy's contention that the payoff should wait until the contract was finalized, wrote to Duffy that his work on behalf of Acranom so far was worth at least $44,000: "I'm asking for reasonable number being on the team had value and it's not zero 50 is fair zero is an insult to my character for you I do 44not penny less and tomorrow as agreed other than that tell him [*i.e.*, Monarca] I am out[.]"  *Id.*  Duffy complained to Monarca, "I tried to explain to uncle[.] The deal was for the contract sum and we not there yet he's getting mad but it is what it is[.]"  GX 20.

Between May and July, Diamantis repeatedly demanded money, cried poverty, and threatened to pull Acranom from the Tolland job.  Among other things, Diamantis: said that he had "$318 in my account thanks to [Monarca]," GX 21B; reasoned that "I asked for the minimum of what we bid … I asked for 40," GX 21B; pleaded "we got tolland meeting Friday I'm begging you I need this done then[,]" GX 23; lamented "I have negative in my account 30 in my pocket tell him [*i.e.*, Monarca] come prepared tomorrow tolland we talk and Check," GX 23; demanded

"I need 5k desperately tomorrow from him [*i.e.*, Monarca] or anyone I don't care who I shouldn't have to beg he owes me 77 2 months ago[,]" GX 30; demanded that Duffy get Monarca to "give me 20 he can keep the rest and the job but I never want to hear the company name again[.]" and otherwise "if you can't get me my 20 then he can shove that up his ass too[.] I better never see him at tolland[,] GX 28; warned Duffy that he would not provide further help on Weaver "til he does rt thing for tolland…. I need that coin Johnny like last month," GX 33; and cautioned Duffy "I will wait til Monday for [Monarca] to give you 40 . If not then I think D'Amato needs a new mason for tolland then he will see how real the job was," GX 33; and threatened Duffy "Bottom line have him give you 40 for Monday or he's out," otherwise, "Tuesday there will be a new mason[,]" GX 34.

Bank records suggest Diamantis's demands were met, at least in part: on each of August 20, September 30, and October 11, 2019, Duffy cashed a $10,000 Acranom check; on each of those days, Diamantis also made a large cash deposit ($7,500, $1,100, and $5,000, respectively). GX 600A.

After the Birch Grove design process was complete, Acranom submitted a final proposal that, per Diamantis's demand, would "add 70" thousand dollars to cover his payment. GX 308. Diamantis advised Acranom to increase their proposal even more, saying "I'm sure you are off half mil," and then reported that Acranom's contract number (more than $2.8 million) was "approved by D'Amato." GX 42. That same day, Diamantis wrote to Duffy, "So whatever your boss can do sooner than later is greatly appreciated." *Id.*

Once its Birch Grove contract was finalized, evidence shows that Acranom continued making payments to Diamantis. These included: evidence of a January 15, 2020 meeting where Monarca would bring a purported "birthday" card for Diamantis, GX 44, 45, 45B, even though it

was not Diamantis's birthday, GX 61, 1017, and where Monarca gave Diamantis $5000 from Acranom, followed a day later by Diamantis depositing $3000, GX 600A; on January 21, 2020, Monarca cashed a $6,000 Acranom check and gave the cash to Diamantis, who deposited $1,500 in cash that day and $3,500 in cash the day after, GX 600A; evidence of a January 30, 2020 meeting between Monarca and Diamantis, GX 47, followed a day later by Diamantis depositing $1,000 in cash, GX 600A; and evidence of a February 18, 2020 meeting between Diamantis and Monarca, GX 47, followed a day later by Diamantis depositing $4,000 in cash, GX 600A.

Monarca did not adhere to Diamantis's payment schedule. On February 27, 2020, unhappy with Acranom's unfulfilled promises, Diamantis threatened to interfere with its work in Hartford, writing to Duffy, "I give him til tomorrow then I tell Hartford I made a mistake In the math[.]" GX 48. The next day, Duffy and Diamantis continued to discuss Monarca's tardiness. Duffy suggested that "U should tell him to go back on monthly. Jan. Feb. mar. April. All done. 15 15 15 17.5 Remember That was the deal. He changed it." GX 49. On March 2 and 10, 2020, Diamantis made cash deposits of $5,000 and $2,000, respectively. GX 600A. On March 19, 2020, Monarca cashed a $5,540 Acranom check and gave the cash to Diamantis, who deposited $4,900 in cash that day. GX 600A. On April 15, 2020, Monarca cashed a $6,000 Acranom check and gave the cash to Diamantis, who deposited $3,000 in cash two days later. GX 600A.

On April 18, 2020, Duffy and Diamantis discussed the status of Acranom's payments, acknowledging a disagreement as to whether Acranom still owed Diamantis "12 1/2" thousand dollars per Monarca, GX 51, or whether there was, per Diamantis, "20 left," GX 52.

The pattern of cashed Acranom checks closely followed by Diamantis's large cash deposits continued. On April 20, 2020, Monarca cashed a $5,500 Acranom check, and on April 21, 2020, Duffy cashed a $5,000 Acranom check; on April 23, 27, and 30, Diamantis made cash deposits of

$1,200, $1,100, and $3,600, respectively. GX 600A. On May 5, 2020, Monarca cashed a $3,500 Acranom check; Diamantis deposited $1,700 in cash two days later. GX 600A. On May 11, 2020, Monarca cashed a $5,000 Acranom check; Diamantis made cash deposits of $1,000 that day and $2,500 the day after. GX 600A. On May 28, 2020, Monarca cashed a $5,000 Acranom check; Diamantis deposited $3,000 in cash two days later. GX 600A.

\* \* \*

The Government's fact witnesses relevant to the Acranom bribery scheme may include:

- Monarca (co-conspirator);

- Duffy (co-conspirator);

- Ouelette (Newfield employee);

- Dellaripa (Hartford employee);

- Salafia (Arcadis deputy director);

- Jack Butkus (Arcadis director);

- Walter Willett (Tolland's Schools Superintendent); and

- Michelle Dixon.

The Government's exhibits will include:

- electronic messages among Diamantis, Monarca, and/or Duffy, admissible as non-hearsay under Federal Rule of Evidence 801(d)(2)(A) & (E) (discussed below);

- records maintained by the City of Hartford, its employees (such as Dellaripa), and its contractors or agents (such as Newfield, Arcadis, and Acranom), including communications, contracts, and invoices, admissible as an exception to the rule against hearsay under Federal Rule of Evidence 803(1), (6) & (8);

- records maintained by the Town of Tolland, its employees (such as Willett), and its contractors or agents (such as D'Amato and Acranom), including communications, contracts, and invoices, similarly admissible under Federal Rule of Evidence 803(1), (6) & (8); and

- Acranom's, Monarca's, Duffy's, and Diamantis's telephone and bank records, admissible under Federal Rule of Evidence 803(6).

### C.    The CAP Scheme and Conspiracy

The evidence will also show beyond a reasonable doubt that from 2019 until 2021, Diamantis committed and conspired to commit Hobbs Act extortion and bribery with respect to a construction administrator firm called Construction Advocacy Professionals, LLC ("CAP").

CAP was owned by Diamantis's co-conspirator Antonietta Roy, who has pled guilty conspiracy to commit § 666 bribery in violation of 18 U.S.C. § 371. *U.S. v. Roy*, Case No. 24-cr-106-SRU, Dkt. ##5, 7. As with Acranom, Diamantis induced Roy to make payments from CAP both under color of official right (namely, in exchange for helping CAP get work on projects in Tolland, New Britain, and Hartford) and through fear of economic loss (namely, by threatening to blackball CAP in the school construction industry).

In or about March 2019, Diamantis pressured Roy to hire his daughter—Anastasia Diamantis ("Anastasia")—at CAP. Roy will testify that she asked Diamantis to recommend candidates for an assistant project manager position. Diamantis mentioned two names, one of which was Anastasia, a State of Connecticut employee seeking part-time work for evenings and weekends at a salary of approximately $20 per hour, who had no professional experience in construction. Because of Diamantis's position of influence in the industry, Roy interviewed only Anastasia and, on April 15, 2019, hired her to work at CAP. Roy felt pressure from Diamantis

and feared he would retaliate against her new company.  Although Roy would typically pay an hourly salary of $25 to $35 for the periodic data entry work that this position required, because of Diamantis's powerful position, she offered to pay Anastasia $45 as an independent contractor.  GX 80.

In exchange for Roy's agreement to help his daughter, in April 2019, Diamantis suggested that the Town of Tolland hire CAP as a construction administrator for the ongoing Birch Grove project.  Willett, the Tolland school superintendent, will testify that Diamantis suggested the town hire a construction administrator and recommended Roy (and no other firms) for the position.  On June 20, 2019, CAP and Tolland entered into a $70,000 consulting agreement that expired in September 2019.  GX 305.

Roy will testify that Diamantis repeatedly asked her to "take care of" his daughter, specifically referencing Anastaisa's unpaid student loans.  Roy understood these to be requests for payments to Anastasia, with which she repeatedly complied.  For example, in addition to Anastasia's regular salary, Roy gave Anastasia a $500 "bonus" on August 27, 2019 and a $1,000 personal check on December 13, 2020.  GX 600B.

On other occasions, Diamantis demanded that CAP make payments directly to him.  For example, Roy will testify that, in July 2019, Diamantis solicited her for a "donation" from CAP. Understanding that her business's success depended on keeping Diamantis happy, on July 8, 2019, Roy wrote a $1,000 check to Diamantis on behalf of CAP, which he cashed on two days later.  GX 600C.

With Diamantis's support, CAP continued to obtain work and, before the original contract expired, it entered into a $460,000 amended consulting agreement with Tolland that extended until October 1, 2021.  GX 307.

That same month, the City of New Britain asked Diamantis how to obtain approximately $12 million in reimbursement for completed school projects that were supposed to be funded by State grants. GX 411. In October 2019, the Mayor of New Britain met with Diamantis about this issue. GX 405. Diamantis recommended that the New Britain Board of Education hire CAP to help complete the paperwork necessary to obtain reimbursement from OSCGR. GX 404, 415. On October 11, 2019, CAP and the City of New Britain entered into a $115-per-hour consulting agreement. GX 402, 404.

HSBC chairman Melvyn Colon[5] will testify that, in a conversation in late 2019, Diamantis informed him that Hartford should hire a construction administrator for its $170 million Morgan Gardner Bulkeley High School project. *See* GX 500, 505. Several members of the Bulkeley project team will testify that, because the City already had a program manager (Arcadis), a construction administrator was redundant. *See also* GX 506, 510. Nevertheless, Diamantis was unconcerned about any overlap with Arcadis, promising that the State would fully fund a construction administrator at Bulkeley. *See* GX 506, 510, 523. Indeed, in December 2019, Diamantis insisted on personally reviewing and approving the scope of services and qualifications for the position. GX 511.

Colon will further testify that Diamantis recommended Roy as the Bulkeley construction administrator (and no other firm); Arcadis's deputy director, Sebastian Salafia, will testify that Diamantis said that he wanted CAP. *See also* GX 506. Of the four firms that applied in March 2020, CAP's $2,295,114 proposal was the third lowest. GX 526. But the weight of Diamantis's influence led the HSBC subcommittee members—Colon and Dellaripa—to find a way to pick CAP. They edited CAP's proposal by removing an assistant project manager position worth

---

[5] Identified as HSBC Member-1 in the Indictment. Indictment ¶ 9.

approximately $526,000, then used the reduced fee amount of $1,769,050 to select CAP. GX 518, 526. No other firm had the opportunity to similarly revise its proposals. Even after this revision, CAP's proposal was still only the third lowest. GX 526. Both Colon and Dellaripa will testify that their actions were influenced by Diamantis's preference for CAP. On April 29, 2020, the Hartford and CAP entered into a $1,769,050 construction administrator contract for Bulkeley. GX 524.

Even though Roy found Anastasia's work unimpressive and thought her not worth retaining, on May 18, 2020, Roy nonetheless converted her from an independent contractor into a W-2 employee, still at $45 per hour. GX 82, 83. Roy will testify that she did this to keep Diamantis happy with CAP.

In December 2020, after CAP won a contract on a project at Horst Engineering's facility in East Hartford, Diamantis claimed that he had made a donation in CAP's name to help publicize the company and demanded repayment. Although Roy did not necessarily believe Diamantis, because of his official position, she wrote him a $1,000 check on January 4, 2021. GX 600C.

In March 2021, shortly after CAP entered into another contract with the New Britain Board of Education, GX 414, Diamantis solicited Roy for another payment. On March 17, 2021, acting on behalf of CAP, Roy wrote Diamantis a $1,500 check. GX 600C.

After Diamantis asked for more money from CAP, on August 1, 2021, Roy gave him approximately $1,000 in cash.

Eventually, in October 2021, Diamantis left his State position. The same day that Roy learned that Diamantis was no longer in a position to retaliate against CAP, she terminated Anastasia's employment.

\* \* \*

With respect to CAP, the Government's fact witnesses may include:

- Roy (co-conspirator);

- Anastaisa Diamantis;

- Duffy (co-conspirator);

- Dellaripa (Hartford employee);

- Melvyn Colon (HSBC chair);

- Salafia (Arcadis deputy director);

- Jack Butkus (Arcadis director);

- Walter Willett (Tolland school superintendent); and

- Michelle Dixon.

The Government's exhibits will include:

- records maintained by the City of Hartford, Town of Tolland, and City of New Britain, and their employees, contractors, and agents, including communications, contracts, and invoices, admissible as an exception to the rule against hearsay under Federal Rule of Evidence 803(1), (6) & (8); and

- CAP's, Roy's, Anastasia's, and Diamantis's telephone and/or bank records, admissible under Federal Rule of Evidence 803(6).

**D.    The Cover-Up**

In connection with the investigation into his bribery schemes, Diamantis lied to federal investigators in interviews on August 29, September 19, and December 8, 2023.  The fourteen false statements discussed below are charged in Counts Nine through Twenty-Two.

During the August interview, which the FBI agents recorded, Diamantis made the following false statements:

- He "didn't recommend" CAP for the Birch Grove project. GX 900A (Indictment ¶ 163, Count Nine).

- He "did not help [Roy] get on, get any jobs." *Id.* (Indictment ¶ 163, Count Ten).

- The Tolland superintendent Walter Willett was wrong to say he was "pressured to select CAP" by Diamantis because "I didn't care who the CA was, because the CA wasn't going to do anything for me." *Id.* (Indictment ¶ 163, Count Eleven).

- He "did not recommend D'Amato" for the Birch Grove project. *Id.* (Indictment ¶ 163, Count Twelve).

During the September interview, which the FBI agents also recorded, Diamantis made the following false statements:

- He did not "encourage [Roy] to reach out to [his daughter, Anastasia] for a job" at CAP. GX 901A (Indictment ¶ 163, Count Thirteen).

- He told Willett, with respect to the Birch Grove construction administrator position, "I don't give a damn who you hire, hire somebody because we need something, somebody to control. I could stake my life on that statement to him, don't care who you hire, hire somebody." *Id.* (Indictment ¶ 163, Count Fourteen).

During the December interview, which took place at the United States Attorney's Office, Diamantis made the following false statements:

- He never helped any business obtain work related to school construction projects. GX 902 (Indictment ¶ 163, Count Fifteen)[6].

---

[6] GX 902 is an investigating agent's memorandum of interview, which the Government does not

- He was not involved in hiring general contractors, construction managers, architects, or subcontractors on any school construction projects, including Birch Grove, Bulkeley, and Weaver. *Id.* (Indictment ¶ 163, Count Sixteen).

- The OSCGR staff—and not Diamantis—suggested Tolland hire a construction administrator for the Birch Grove project. *Id.* (Indictment ¶ 163, Count Seventeen).

- Willett recommended D'Amato for the Birch Grove project. *Id.* (Indictment ¶ 163, Count Eighteen).

- Diamantis did not suggest CAP as a construction administrator on the Bulkeley project. *Id.* (Indictment ¶ 163, Count Nineteen).

- Acranom did not receive special treatment on the Weaver project. *Id.* (Indictment ¶ 163, Count Twenty).

- Roy's payments to Diamantis were not donations or bribes, but were for legal work he performed for CAP. *Id.* (Indictment ¶ 163, Count Twenty-One).

- Diamantis did not receive payment from any business working on the Birch Grove, Bulkeley, or Weaver projects, including Acranom. *Id.* (Indictment ¶ 163, Count Twenty-Two).

\* \* \*

In addition to the above, the Government will offer testimony from FBI Special Agent Jennifer Wagner and IRS-CI Special Agent Eric Wethje, and recordings of Diamantis's interview statements.

---

expect to seek to introduce.

### III.    Trial Issues

The Government and defendant have been working diligently to reach pre-trial agreement on the authenticity and admissibility of evidence, and will raise any issues with the Court as needed.  The Government flags the following matters that are under discussion and the relevant law, should Court involvement be required.

### A.    Summary Charts

The Government will seek admission of summary charts, namely, Government's Exhibits 600A–C, and 700A–H.  Defense counsel has been reviewing those charts and we will alert the Court if there is an objection.

Summary charts of this type are admissible at trial pursuant to Rule 1006, which provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation.  The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place.  The court may order that they be produced in court.

Thus, Rule 1006 allows a party to "prove the contents of voluminous writing that cannot be examined in court without causing inconvenience and waste of time by presenting evidence of their contents in abbreviated form."  6 Weinstein's Federal Evidence § 1006.02 (2021); *Fagiola v. National Gypsum Co. AC & S, Inc.*, 906 F.2d 53, 57 (2d Cir. 1990) (affirming the admission of a summary chart which "contained totals derived through the simple addition of sales…[which was] used to avoid forcing the jury to examine boxes of documents in order to make simple calculations").  The proponent of a summary chart need not demonstrate that it would be impossible for the jury to examine all of the underlying records, but only that such in-court examination would be inconvenient.  *United States v. Possick*, 849 F.2d 332, 339 (8th Cir. 1988); *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991).  As such, the materials "underlying

the Rule 1006 summaries need not be admitted into evidence." *Air Safety, Inc. v. Roman Catholic Archbishop of Boston*, 94 F.3d 1, 7 n.14 (1st Cir. 1996); *citing Bakker*, 925 F.2d at 736-37.

Although a Rule 1006 summary must fairly and accurately represent the data that it purports to summarize, it need not address all of the records that bear on the matter at issue and may summarize a specific portion of those records to demonstrate a particular relevant fact. *Fagiola*, 906 F.2d at 57 (affirming a summary of incomplete business sales records of asbestos products to demonstrate low absolute volume); *Bakker*, 925 F.2d at 737 (rejecting the claim that composite tape was not fairly representative: "Once the [district] court properly determined that the tapes were admissible, Bakker had ample opportunity to demonstrate to the jury the proper weight that it should attach to the composites.").

In affirming the admission of a summary chart of phone calls and text messages, the Second Circuit has held that "even eight pages of phone bills can contain hundreds of calls and text messages, and this information would have been difficult for the jury to synthesize and evaluate without the aid of a summary." *United States v. Miller*, 954 F.3d 551, 565 (2d Cir. 2020). Moreover, such a summary chart "need not include all the information that appears on a phone bill, such as the duration of each call, if particular kinds of information are not relevant and are either uniformly included or uniformly excluded." *Id*. The court specifically affirmed the use of a summary chart that included only the calls of selected individuals, and permitted the Government to include other information (*e.g.*, the names of the callers) not in the phone records but which had been separately proven. *Id*.

## B.      Co-Conspirator Statements

The Government will seek to admit certain out-of-court statements by co-conspirators. As with summary charts, the Government and counsel for the defendant are working diligently to

resolve any disagreements over admissibility of co-conspirator statements, or to identify any disagreements that will require Court involvement.

The proffered statements are written or oral statements made between 2018 and 2021 by Monarca and Duffy in furtherance of the Acranom conspiracy, or made between 2019 and 2021 by Roy in furtherance of the CAP conspiracy.[7]  These statements were made to Diamantis, to other witnesses in the presence of Diamantis, or to other witnesses outside of Diamantis's presence.

Federal Rule of Evidence 801(d)(2)(E) provides that a statement is admissible non-hearsay if "made by the party's co-conspirator during and in furtherance of the conspiracy."  Fed. R. Evid. 801(d)(2)(E).  It is well settled in the Second Circuit that co-conspirator statements are admissible under that rule if they satisfy two pre-requisites: "first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy."  *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). Although the content of the co-conspirator statement "must be considered," Fed. R. Evid. 801(d)(2)(E), "there must be some independent corroborating evidence of the defendant's participation in the conspiracy," *Gigante*, 166 F.3d at 82.

In the Second Circuit, district courts customarily admit the Government's proffered co-conspirator statements at trial on a conditional or provisional basis, then make an admissibility determination using a preponderance of the evidence standard—commonly referred to as a "*Geaney* ruling"—at the close of the Government's case-in-chief.  *See United States v. Geaney*, 417 F.2d 1116, 1120 (2d Cir. 1969).  *See also United States v. Cota*, 953 F.2d 753, 758 (2d Cir. 1992) ("it is accepted practice for a trial judge to admit one disputed piece of evidence subject to

---

[7] Diamantis's own statements are non-hearsay statement of an opposing party and therefore admissible under Federal Rule of Evidence 801(d)(2)(A).

receipt of other evidence that, by the end of the government's case, will establish the alleged co-conspirator's involvement.")  Here, the Government expects it will satisfy both admissibility requirements by a preponderance of the evidence.

First, the Government's case will include extensive evidence that the defendant was engaged in a conspiracy with each of Duffy, Monarca, and Roy.  Such evidence will include the incriminating content of each proffered statement, electronic communications among Monarca, Duffy, and/or Diamantis in the Acranom conspiracy (some of which are quoted above), testimony by each of the declarants concerning their specific conspiracy with Diamantis, bank documents establishing payments made by or through each declarant to Diamantis, and construction project documents and testimony by percipient witnesses proving that either Acranom or CAP received a significant benefit thanks to official acts by Diamantis.

Second, and similarly, the Government will offer substantial evidence that each proffered statement was made during the course of and in furtherance of the relevant conspiracy.

Statements made during the course of a conspiracy include statements made by a co-conspirator before the completion of the criminal object of the conspiracy.  *See Haywood v. Portuando*, 2003 WL 1563770, at *22 (S.D.N.Y. Sept. 19, 2003) (statements "unquestionably were made during the course of the conspiracy" because "they were each made prior to the realization of the overall goal.").  Here, each proffered statement occurred during the course of the relevant conspiracy and before its aim were fully achieved; the evidence will show that the Acranom conspiracy began in 2018 and continued into at least 2021, while the CAP conspiracy persisted from 2019 to at least 2021.

The scope of a statement made in furtherance of a conspiracy is broad, and includes statements "that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to

foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy," or statements intended to prompt the listener—including non-conspirators—to respond in a way that promotes or facilitates the carrying out of a criminal activity. *United States v. Maldonado-Rivera*, 922 F.2d 934, 958-59 (2d Cir. 1990). Here, the evidence that each proffered statement was made in furtherance of the relevant conspiracy will include its inculpatory content, the context in which it was made, the declarant's testimony about the scope of their conspiracy and how the statement advanced its aims, and documents and percipient witnesses testimony showing payments by the declarants' respective company to Diamantis and reciprocal benefits provided by him.

Accordingly, the Court should permit the Government to offer co-conspirator statements made in furtherance of Diamantis's charged conspiracies, subject to a later *Geaney* finding.

### C.      Statements of the Defendant

The Government intends to offer several out-of-court statements of the defendant, as well as co-conspirator statements and other related non-hearsay statements, through text messages, emails, and witness testimony. Again, the parties are in discussions to identify any issues with the Government's anticipated evidence. The Government is not yet aware of any of his own statements the defendant may attempt to offer in his defense.

The Government is entitled to introduce a defendant's own prior statements as evidence against the speaker under Rule 801 as statements made in an individual capacity offered against an opposing party. *See* Fed. R. Evid. 801(d)(2)(A). Moreover, as discussed above, the Government may offer certain co-conspirators' statements against Diamantis as the statement of a party's co-conspirator made during and in furtherance of the conspiracy. *See* Fed. R. Evid. 801(d)(2)(E). In both instances, the Government may also introduce surrounding or responsive statements because they provide context for Diamantis's or his co-conspirator's statement and are not offered for the truth of the matter asserted. *See United States v. Dupre*, 462 F.3d 131, 137 (2d

Cir. 2006) (non-witnesses' emails "provide context for defendants' messages sent in response to them, messages whose admissibility is not contested. *See* Fed. R. Evid. 801(d)(2)."); *United States v. Paulino*, 445 F.3d 211, 216 (2d Cir. 2006) ("It has long been the rule that '[s]o long as…statements are not presented for the truth of the matter asserted, but only to establish a context…, the defendant's Sixth Amendment rights are not transgressed.'") (*quoting United States v. Barone*, 913 F.2d 46, 49 (2d Cir. 1990)).

Rule 801(d)(2)(A), however, is not reciprocal, and does not permit the defendant to admit his own self-serving hearsay. *See United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are 'hearsay, and...not admissible.'") (citation omitted); 5 Weinstein's Federal Evidence § 801.3 ("A party cannot use this provision to offer his or her own statements into evidence.").  Thus, allowing Diamantis to introduce his own prior statements through witnesses or exhibits would provide an end-run around the adversarial process by allowing him an opportunity to "testify" without being subject to "the oath, the witness' awareness of the gravity of the proceedings, the jury's ability to observe the witness' demeanor, and, most importantly, the right of the opponent to cross-examine." *Williamson v. United States*, 512 U.S. 594, 598 (1994).  In short, the Court should not allow the defendant to introduce his own out-of-court statements unless they satisfy some other exception or non-hearsay purpose.  The Government reserves its right to address any such offer when presented.

## IV.     Conclusion

The Government respectfully reserves the right to raise and respond to additional issues as they arise.

Respectfully submitted,

DAVID E. NOVICK
Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515

            /s/
_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv02874
david.novick@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.: (203) 821-3700

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 26, 2025, a copy of the foregoing was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
