## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA<br>    PLAINTIFF<br><br>vs.<br><br>KONSTANTINOS DIAMANTIS, AKA "KOSTA"<br>    DEFENDANT | 3:24-CR-00108 (SRO) (RAR)<br><br><br><br>OCTOBER 29, 2025 |

### DEFENDANT'S MOTION FOR POST-TRIAL HEARING ON POTENTIAL JURY MISCONDUCT AND FOR RELIEF PURSUANT TO FEDERAL RULES OF CRIMINAL PROCEDURE RULE 33

Despite the trial court's order to jurors not to discuss their deliberations with anyone, including the press, the foreman of the jury, Juror 22, walked out the courthouse door after the verdict was recorded and delivered the following statement: She avoided news accounts of the case during trial, noting that while she had not heard of the case before trial, others on the panel had.[1] Her remark raises serious questions about whether potential jurors were candid with the Court during the brief court-conducted voir dire conducted in case on October 3,

---

[1] Although the juror gave her name to the press, the Court's order regarding juror anonymity governs. As a result, she shall be referred to by her juror number, and the new story referring to her remarks shall redact her name. See Ex. 1, p. 3 (last accessed 10.29.25).

1

2025.[2] The defendant therefore moves for a hearing at which jurors in the case can be asked whether they made a full disclosure of their awareness of press conference about the case prior to the commencement of evidence and whether they read press coverage during trial. This request does not run afoul of F.R.E. 606.

**I.   Factual Background**

Eighty-two venire people were questioned by the Court on October 3, 2025. During the voir dire, the Court asked: "Has anybody heard of Mr. Diamantis or heard anything about this case before you came to court today?" Voir Dire Transcript, hereinafter "VT," p. 108. Six potential jurors responded that they had: numbers 30, 43, 55, 57, 61 and 63. Id., pp. 108-109. The Court excused potential jurors 30 and 63 for cause without further questioning. Id., pp. 129.

Four panelists were questioned at side bar with counsel present. All indicated some familiarity with press coverage, and all agreed that they could put what they had read aside to decide the case based solely on the evidence at trial. See: 43, Id., pp. 129-131; 55, Id, pp. 131-134; 57, Id., pp. 134-136; and, 61, Id., pp. 136-137. Neither venire persons 43 or 55 were selected for the jury and were excused by the parties peremptorily. Only panelists 57 and 61 were selected for

---

[2] The total voir dire in this case lasted about five and one-half hours. VDT, pp.    , in sharp contrast to the 21-days in took to pick jurors in an Eighth Circuit high-profile case. *U.S. v. Rodriguez*, 581 F.3e 775, 784-86 (8th Cir. 2009).

2

the jury. Id., p. 168. Juror 57 never appeared in Court after being selected when evidence began on October 6. The juror was excused by the Court after writing to the Court about an inability to serve on the jury due to childcare issues.

The only juror acknowledging reading anything about the case to serve on the jury was juror 61. According to the comments made by the foreperson to the press, multiple jurors were aware of the press. If the foreperson was correct, then one or more jurors was not candid with the Court during voir dire, or, despite repeated admonitions by the Court during trial to avoid media coverage of the trial, nonetheless read or otherwise became aware of coverage without notifying the Court.

Mr. Diamantis is one of four person's charged in two separate conspiracies to engage in extortion and bribery. In one conspiracy the putative victim is Acranom; two of Acranom's officers, Sal Monarca and John Duffy, testified as government witnesses after pleading guilty. In the other conspiracy, the putative victim was Construction Advocacy Professionals; the owner of the firm, Antoinette Roy, testified as a government witness after pleading guilty. The witnesses had cooperation agreements with the government.

Before trial, the defendant moved to preclude the testimony of Duffy, Monarca and Roy on application of the intracorporate conspiracy doctrine, on the

theory that in the case of closely held corporations, owners of an entity cannot logically held to conspire against themselves. The trial court denied that motion, but did order that the convictions of the co-conspirators were inadmissible unless the defense wished to raise both their convictions and cooperation agreements as impeachment material. In so ruling, the Court observed that admission into evidence of Mr. Diamantis's co-conspirators pleas would unfairly prejudice Mr. Diamantis in violation of FRE 403 rendering a conviction of Mr. Diamantis more likely if jurors heard that his co-conspirators had already pleaded guilty. The defense elected to keep the pleas and cooperation agreements from the jury. DE, 74.

Even so, the Court sua sponte raised the issue of cooperation agreements during voir dire, reading a voir dire question submitted by the government before the Court ruled that the guilty pleas of the co-defendants was inadmissible unless the defense raised them. "You may hear from an individual who is cooperating with the government with a hope of an expectation of receiving a more favorable sentence in federal criminal cases against her. Do any of you have any strong feelings about cooperating witnesses that would prevent you from rendering a fair and impartial verdict?" VT, pp. 111-112. No venireperson responded. Id, p. 112. Neither the government nor the defendant objected to the Court's surprising decision to read this question or otherwise asked for relief.

4

## II. Why A Post-Trial Hearing Is Necessary

Simple logic suggests that one or more jurors in this case were either exposed to potentially prejudicial pre-trial publicity in this case and failed to disclose it, or that one or more jurors were exposed to potentially prejudicial publicity during trial. Only two jurors selected to serve, numbers 57 and 61, told the Court they had been exposed to pre-trial publicity. Number 57 was discharged before the panel returned to hear evidence. The deliberating jury had one juror, Number 61, who acknowledged having read or heard something about Mr. Diamantis's case before jury selection.[3]

Within an hour or so of the verdict's being returned, the foreperson announced to the world that more than one juror had read or heard about the case. Presumably, this became apparent during jury deliberations. Among the things reported in the press in numerous stories were the guilty pleas of Roy, Duffy and Monarca, and the fact that Mr. Diamantis has been charged in a second indictment with separate allegations of corruption arising from a Medicaid fraud investigation. See, for example, Ex. 1. The government tilted in the direction of conduct unrelated to the charges in the instant case by taunting Mr. Diamantis

---

[3] The total voir dire in this case lasted about five and one-half hours. VDT, pp.   , in sharp contrast to the 21-days in took to pick jurors in an Eighth Circuit high-profile case. *U.S. v. Rodriguez*, 581 F.3e 775, 784-86 (8th Cir. 2009).

during cross-examination when it asked, in effect, what other misconduct he had engaged in, noting that fraud investigators were present in court and were anxious to learn about it. The remark, and the abrasive tone of the cross examination led counsel for Mr. Diamantis to request a mistrial. (DE, 95)

The defendant acknowledges that FRE 606 prohibits inquiry into the deliberations of a jury once a verdict has been reached. However, he insists that the trial court has a responsibility to ensure that he did, in fact, enjoy his right to an impartial jury. Any highly publicized criminal trial presents the risk of compromising a defendant's right to a fair trial. *Chandler v. Florida*, 449 U.S. 560, 574 (1981) "Intense publicity surrounding a criminal proceeding … poses significant and well-known dangers to a fair trial." *U.S. v. Brown*, 218 F.3d 415, 423 (5th Cir. 2000).

Mr. Diamantis requests that this Court hold a hearing at which each juror is summoned to be asked whether they were aware of media coverage of Mr. Diamantis and his cases before or during the deliberations in this case. Mr. Diamantis reserves the right to request appropriate relief once the jurors are summoned and their answers made a part of the record, including a demand for a new trial under FRCP Rule 33.

Prejudice is presumed in a case in which jurors discuss inadmissible information printed in a newspaper story. *Bulger v. McClay*, 575 F.2d 407, 409-10 (2d.Cir. 1978). The defendant asserts that the trial court has a responsibility to conduct a post-verdict inquiry because a question has arisen as to whether one or more jurors was either not candid during selection, or subsequently became aware of media coverage of the case while sitting as a juror. The question presented is whether, in fact, actual exposure occurred; the foreman's comments to the press make clear that there is a potential that this did occur.

A majority of Circuits addressing this issue have held it is reversible error for the Court to fail to make an inquiry in cases in which a fair question arises about whether jurors were exposed to press coverage. *Gov't of V.I. v. Weatherwax*, 20 F.3d 572, 578-79(3d Cir. 1994); *U.S. v. Gray*, 788 F.2d 1031, 1032-33 (4th Cir. 1986); *U.S. v. Beckner*, 69 F.3d 1290, 1293-94 (5th Cir. 1995); *Goins v. McKeen*, 605 F.2d 947, 953 (6th Cir. 1979); *Oswald v. Bertrand*, 374 F.3D 475, 480-481 (7TH Cir. 2004); *U.S. v. Richardson*, 651 F.2d 1251, 1252-53 (8th Cir. 1981); *U.S. v. Waters*, 627 F.3d 345, 363-64 (9th Cir. 2010); *U.S. v. Davis*, 60 F.3d 1479, 1484-85 (10th Cir. 1995); *Coleman v. Kemp*, 778 F.2d 1487, 1541-43 (11th Cir. 1985).

A Second Circuit case, *U.S. v. Guzman Loera*, 24 F.4th 144, 161-162 (2d Cir. 2022), held it was not reversible error to fail to conduct an inquiry after a juror

reported that fellow jurors had followed press coverage during trial. However, in that case an alleged "unnamed juror" reported to a magazine reporter that jurors followed coverage of the trial on Twitter in violation of their oaths and the court's sequestration order, and that they learned of unrelated and prejudicial allegations of conduct unrelated to the charges being tried. The trial court failed to hold a hearing as requested. The Second Circuit upheld the trial court's ruling noting that "the unsworn, uncorroborated statements that one unidentified juror made to a magazine reporter do not constitute the 'clear, strong, substantial and incontrovertible evidence," requiring such a hearing be held. Id., at 161, citing *U.S. v. Sun Myong Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983).

In the instant case, the statements are unsworn, but come from an identified source, the foreperson, spoken in front of the courthouse immediately after the verdict was returned. Her words are clear and introvertible – more than one juror was aware of news coverage of some sort. This case is therefore unlike *Guzman,* a case in which the trial court apparently addressed exposure to media with jurors twice during the trial. 24 F.4th, p. 161-162. No such inquiries were made in this case, as there did not appear to be a need for them.

## III. Conclusion

Mr. Diamantis requests that members of the jury, and the alternates discharged before deliberations began, be summoned to appear at a hearing to determine whether any or all of them were aware of press coverage of Mr. Diamantis prior to the commencement of evidence and whether any or all of them became aware of press coverage of Mr. Diamantis.

DEFENDANT,
KONSTANTINOS DIAMANTIS, AKA "KOSTA"
By:  /s/  Norman A. Pattis, Esq.
Norman A. Pattis, Esq.
PATTIS & PAZ, LLC
383 Orange St., 1st Floor
New Haven, CT 06511
Tel: 203-393-3017
Fax: 203-393-9745
Email: npattis@pattispazlaw.com
Federal Bar No.: ct13120

## CERTIFICATION

I hereby certify that on October 29, 2025, a copy of the foregoing was filed electronically. Notice of this filing was sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                          /s/    **Norman A. Pattis, Esq.**

# Leader of jury in CT corruption trial says ex-school building chief 'wasn't credible enough for me'

By Ken Dixon, Staff Writer Oct 22, 2025

BRIDGEPORT — The forewoman of the jury that found Kosta Diamantis guilty on 21 felony charges said Wednesday the state's former top school building official failed to convince her that the mostly cash payments of tens of thousands of dollars from state contractors were for consulting fees or legal advice outside the scope of his state job.

Diamantis' appearance on the witness stand last week also did not help his case, said ▮▮▮▮▮▮▮▮▮▮▮▮ a finance manager who took the role of leading the dozen jurors through the 10 hours of deliberations that led to Wednesday's late-morning verdicts. Even the way he sat at the defense table alongside attorney Norman Pattis was a factor, she noted.

"He's a government official and he's held to a higher standard than most individuals. From my perspective, there wasn't enough evidence before us that those were consulting fees," ▮▮▮▮▮▮ told several reporters outside U.S. District Court shortly after noon. "He definitely said they were legal fees, but there wasn't enough evidence."

Speaking only for herself, under orders from U.S. District Court Judge Stefan Underhill, ▮▮▮▮▮ told reporters Diamantis exuded bad vibes.

"Even just sitting at the defendant's table, just how he carried himself and his character, just wasn't credible enough for me," she said. "When people were

1

testifying, (his) body language, the smirking. Even on the stand, giving narratives that just weren't necessary to give."

████ cited testimony from Antonietta Roy – owner of the Construction Advocacy Professionals site-management firm who paid Diamantis $4,500 and hired his daughter to a $45-per-hour administrative job – and John Duffy, former vice president of Acranom Masonry, as being very persuasive. Both co-conspirators already had pleaded guilty in connection with the case. Others who helped convince ████ she said, were Hartford school building officials and construction experts who wondered why Diamantis inserted CAP into two projects and brokered a $300,000 settlement between Acranom and the city of Hartford over delays in finishing a foundation at Weaver High School.

Duffy is Kosta Diamantis' former brother-in-law, whom Diamantis portrayed as taking tens of thousands of dollars himself in divided payoffs.

████ said if there was anything close to a weakness in the federal case, it was Diamantis' relationship with CAP, where the evidence didn't appear as overwhelming as with Acranom. That company's owner, Salvatore Monarca, another co-conspirator who previously pleaded guilty, estimated on the witness stand that more than $85,000 was paid to Diamantis.

████ said the dozens of text messages from Acranom officials, some of which alluded to payments to Diamantis as "pars," "birdies" and "birthday cards," were very telling of the conspiracies.

"People like to talk a lot with text messages. A lot," she said.

████ said getting picked for the jury on Oct. 3 was inconvenient, but it turned into a memorable, rewarding experience. Other jurors emerging from the courthouse declined to comment on the case.

"There were always going to be questions that we were going to be stuck on, but we definitely got the instructions we needed from the judge to help us get

2

the clarity and the context that we needed to make our decisions accordingly," said ▮▮▮▮, a former federal government employee.

After recalling Diamantis saying he personally reviewed state ethics regulations and law, ▮▮▮▮ said he should have gone further and asked the Office of State Ethics to reassure himself, but instead he never even listed the extra income on the mandatory annual filings of financial interests.

"There was plenty of opportunities for him to recuse himself from any type of decision knowing that 'my ex-brother-in-law works over here' and 'my daughter has a financial interest over here,'" she said.

▮▮▮▮ said the jurors made a point of taking every minute in the courtroom seriously and avoided news accounts during the trial. She noted that while she had not heard of the case before the trial, others on the panel had.

"At the end of the day, this is someone's life," ▮▮▮▮. "So we wanted to ensure that we were really, truly paying attention."

3