UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>KONSTANTINOS DIAMANTIS | No. 3:24-cr-108 (SRU) |

**ORDER DENYING MOTION FOR POST-TRIAL HEARING**

After a nine-day trial, a 12-person jury found Konstantinos Diamantis guilty of 21 counts of extortion, bribery, conspiracy, and making false statements. Some time after the jury delivered its verdict, the jury foreperson spoke to the press about the case. Local media in Connecticut widely published her comments. Based on a single sentence from a single article that paraphrased the jury foreperson, Diamantis requests that I summon all the jurors back to court so that they may be questioned about their exposure to press coverage of the case.

For the following reasons, Diamantis' motion for a post-trial hearing, Doc. No. 113, is **DENIED**.

I.   Background

On May 15, 2024, the Government charged Diamantis with two counts of Extortion by Wrongful Use of Fear or Under Color of Official Right, two counts of Bribery, two counts of Conspiracy to Commit Extortion Under Color of Official Right, two counts of Conspiracy to Commit Bribery, and 14 counts of making False Statements. *See* Indictment, Doc. No. 1. The Government later dropped one of the 14 False Statement charges. *See* 10/15/2025 Min. Entry, Doc. No. 95, at 2. The charges against Diamantis arose from improper payments he received from two companies—Acranom Masonry, Inc. and Construction Advocacy Professionals, LLC

("CAP")—during his tenure with the State of Connecticut's Office of School Construction Grants and Review ("OSCGR").  *See* Indictment, Doc. No. 1

I held jury selection for Diamantis's criminal trial on October 3, 2025.  During voir dire, I asked the 82 potential jurors if any of them had heard of Diamantis or the case prior to that day. 10/3/2025 Trial Tr., Doc. No. 116, at 108:13-15.  Six people answered in the affirmative: Juror Numbers 30, 43, 55, 57, 61, and 63.  *Id*. at 108:20-109:5.  I excused two for cause without further questioning: Juror Numbers 30 and 63.  *Id*. at 152:5-9.  I then questioned the other four (Juror Numbers 30, 43, 55, 57, and 61) at a sidebar with counsel present.  Out of those four, two (Juror Numbers 57 and 61) were ultimately selected for the jury.  *Id*. at 168:2-3.  Before trial began, I excused Juror Number 57 due to a childcare issue.  As a result, only one of the six individuals who had some knowledge of the case against Diamantis—Juror Number 61—served on the jury.

During a sidebar on the day of jury selection, Juror Number 61 admitted that she had read a newspaper article about the case.  *Id*. at 136:5-15.  But she explained that she did not learn much from the article beyond the summary of the case that I had read aloud during jury selection.  *Id*. at 136:16-24.  She also promised to put aside anything that she might have learned from that article if she were selected as a member of the jury.  *Id*. at 137:9-13.  I decided not to dismiss Juror Number 61 for cause, and Diamantis did not use one of his peremptory strikes against her.  Juror Number 61 was then selected to serve on the jury.  *Id*. at 168:2-3

The trial began on October 6, 2025.  Even before trial had begun, I instructed the jury "not to talk to anybody about the case, not to research anything on the Internet, [and] not to read or listen to anything" about the case.  *Id*. at 117:10-117:12.  Throughout the trial, I consistently reminded jurors not to read anything about the case or to discuss the case outside of the

courtroom.  *See, e.g.*, 10/09/2025 Trial Tr., Doc. No. 120, at 847:5-11 ("There has been some publicity about this case.  Please just ignore it.  If the TV is on, just turn it off . . . Walk out of the room.  Don't read any articles").  And after I delivered the jury charge to the verdict, I again warned the jury not to read about the case or discuss it outside of jury deliberations.  10/20/2025 Trial Tr., Doc. No. 125, at 1920:6-8 ("You must not research any issue nor communicate with each other or with anyone else about the case …[.]").  I reminded the jury so often of those rules that Juror Number 22—who would eventually be voted the jury foreperson—began to say those instructions aloud before I even had the chance to do so.  *See, e.g., id*. at 1723:4-5.

After the jury delivered its verdict on October 22, 2025, I advised the jury that they were allowed to but should not feel compelled to speak to the press.  I also instructed them that if they chose to speak to the press, they should voice only their personal views of the trial and not express thoughts voiced by other jurors during deliberations.  As far as we know, only the foreperson ultimately spoke to the press.

On October 22, 2025—the same day that the jury delivered its verdict—CT Insider published an article on the jury foreperson's reflections on the case.  Def.'s Mot. for Post-Trial Hearing, Doc. No. 113, at 11-13 (including full text of Ken Dixon, *Leader of jury in CT corruption trial says ex-school building chief 'wasn't credible enough for me,'* CT Insider, Oct. 22, 2025).  The article primarily recounted how the foreperson concluded that Diamantis was guilty.  The end of the article, however, veered into a discussion of how the foreperson believed other jurors treated the case:

> [The foreperson] said the jurors made a point of taking every minute in the courtroom seriously and avoided news accounts during the trial.  She noted that while she had not heard of the case before the trial, others on the panel had.  "At the end of the day, this is someone's life," [the foreperson] said.  "So we wanted to ensure that we were really, truly paying attention."

3

*Id*. at 13.

On October 29, 2025, Diamantis moved for a post-trial hearing, asserting that the jury foreperson's remark that "others on the panel had" heard of the case before the trial "raises serious questions about whether potential jurors were candid" during voir dire, when none of them—except for Juror Number 61—admitted to having prior knowledge about Diamantis or the case. *Id*. at 1. In his motion, Diamantis asks for "a hearing at which jurors in the case can be asked whether they made full disclosure of their awareness of press [coverage] about the case prior to the commencement of evidence and whether they read press coverage during trial." *Id*. at 2. Although the title of his motion seeks relief under Fed. R. Crim. P. 33, the text of the motion does not request the verdict to be vacated. *See* Fed. R. Crim. P. 33(a) ("Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."). Rather, it merely suggests that, based on the jurors' answers, Diamantis might file a demand for a new trial under Rule 33. Def.'s Mot. for Post-Trial Hearing, Doc. No. 113, at 6 ("Mr. Diamantis reserves the right to request appropriate relief once the jurors are summoned and their answers are made a part of the record, including a demand for a new trial under FRCP Rule 33.").

**II.    Discussion**

The Second Circuit has instructed district courts to "be especially 'hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'" *United States v. Guzman Loera*, 24 F.4th 144, 161 (2d Cir. 2022) (quoting *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983)). "Post-trial jury scrutiny is disfavored because of its potential to undermine 'full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople.'" *United States v. Stewart*, 433 F.3d 273, 302 (2d Cir.

4

2006) (quoting *Tanner v. United States,* 483 U.S. 107, 120-21 (1987)); *see also United States v. Aiyer*, 433 F. Supp. 3d 468, 472 (S.D.N.Y. 2020) (internal citation omitted) (noting that post-verdict jury inquiries pose the very "real risk that jurors may be harassed following a verdict" and may shatter future jurors' belief that "their deliberations will not become public").

      Consequently, "[a]bsent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997) (internal citation omitted). A court must investigate allegations of juror misconduct "only when the party alleging misconduct makes an adequate showing . . . to overcome the presumption of jury impartiality." *United States v. Meeker*, 2018 WL 2175556, at *1 (D. Conn. May 11, 2018) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)). That presumption can be overcome "when reasonable grounds for investigation exist," *i.e.*, "where there is 'clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial.'" *Stewart*, 433 F.3d at 302-03 (citing *Sun Myung Moon*, 718 F.2d at 1234); *see also United States v. Baker*, 899 F.3d 123, 130-31 (2d Cir. 2018) (quoting *Ianiello*, 866 F.2d at 543) ("Allegations of impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and relevant evidence[.]'"). If "it becomes apparent to the trial judge that 'reasonable grounds to suspect prejudicial jury impropriety do not exist,'" the judge should immediately end the inquiry. *Stewart*, 433 F.3d at 303 (citing *Sun Myung Moon*, 718 F.2d at 1234).

      Diamantis fails to provide "clear, strong, substantial and incontrovertible evidence" that would justify a post-trial hearing like the one he requests. At no point during the trial was there

any indication that "extraneous prejudicial information was improperly brought to the jury's attention," Fed R. Evid. 606(b)(2)(A), or that the jurors had read news coverage of the trial.

The only evidence that Diamantis can point to in support of his motion is a single sentence from a single article published after the verdict was delivered. As the Government points out, that sentence—which states that the foreperson "noted that while she had not heard of the case before the trial, others on the panel had"—is not a direct quotation. Gov.'s Mem. in Opp'n to Def.'s Mot. for Post-Trial Hearing, Doc. No. 130, at 4. But even if it were a full quotation, it does not necessarily mean that other jurors knew of the case or of Diamantis prior to trial. After all, the sentence immediately preceding the one at issue paraphrases the foreperson as having said that "*jurors* . . . avoided news accounts during the trial." Def.'s Mot. for Post-Trial Hearing, Doc. No. 113, at 13 (emphasis added). One can reasonably conclude from the article's use of two distinct words ("panel" vs. "jurors") that "panel" refers to the 82 individuals present at jury selection, whereas "jurors" refers to the 16 selected individuals. That interpretation would make sense, because six of the 82 individuals who attended jury selection admitted to hearing about the case. But even if the foreperson meant "panel" to refer to her 15 fellow jurors, that might just mean that two of the selected jurors (Juror Numbers 57 and 61) had learned limited information about the case prior to trial, as they admitted during voir dire.

Diamantis also takes the sentence at issue out of context. Most of the CT Insider article focuses on how the foreperson weighed the evidence against Diamantis, rather than how she perceived other jurors' thoughts or behaviors during the trial. Only the very end of the article references other members of the jury. Even then, the article includes a reference to how the jurors made sure not to expose themselves to prejudicial outside information. A single sentence that—at best—might suggest that some other juror knew of the case before trial is not enough to

justify a post-trial hearing that summons all the jurors back to court. *See Baker*, 899 F.3d at 131 (noting that the evidence in question was "not even a prominent feature of Juror No. 10's lengthy email communication, which makes numerous observations about the trial, ranging over many topics"). Put differently, Diamantis' cherry-picking of one sentence from a much longer article—when that sentence does not even quote the foreperson directly or point to any concrete instance of jury misconduct—does not provide incontrovertible evidence that members of the jury acted improperly. *See Guzman Loera*, 24 F.4th at 161-62 (upholding a district court's decision not to hold a hearing after defendant pointed to a magazine article that alleged that unnamed jurors followed coverage of the trial on Twitter).

### III.   Conclusion

For the foregoing reasons, Diamantis' Motion for a Post-Trial Hearing, Doc. No. 113, is **DENIED**.

SO ORDERED at Bridgeport, Connecticut this 17th day of December 2025.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge