UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM NO. 3:24CR108 (SRU) |
| v. | |
| KONSTANTINOS DIAMANTIS | September 10, 2026 |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

Over a three-year period from 2018 to 2021, defendant Konstantinos (or "Kosta") Diamantis exploited his high-level position in Connecticut state government to solicit and receive bribes from contractors looking to obtain or retain business on massive public school construction projects that were funded in part by the state. Diamantis solicited, cajoled, intimidated, and outright threatened two contractors in particular, Acranom Masonry Inc. and Constructional Advocacy Professionals, LLC ("CAP"), to provide him with compensation in exchange for using his influence to get those contractors work. Because Diamantis exercised almost unfettered control over who was awarded contracts, Acranom and CAP acceded to his demands and paid tens of thousands of dollars in bribes lest they be excluded from receiving lucrative school construction work. The cities and towns building these schools likewise were compelled to bend to Diamantis's will rather than face the risk that he would refuse to fund their most critical projects. As a result, they hired contractors like Acranom and CAP because of Diamantis's directive rather than because of quality or price. Municipalities were unaware that the real reason those contractors were retained was because they were paying Diamantis.

Diamantis's corruption had tangible effects on the people of Connecticut. In the case of Acranom, the bribes paid to Diamantis were added into the price that was ultimately charged back to state taxpayers. Moreover, Diamantis caused Acranom to be hired despite serious concerns

about the quality of its work. With regard to CAP, Diamantis caused it to be hired for entirely superfluous jobs, resulting in state taxpayers paying millions in unnecessary expenses. More than the financial ramifications or the quality of the schools built under his regime, though, Diamantis did immeasurable damage to a critical state office tasked with one of the most fundamental obligations of state and local government, that is, providing a safe and secure learning environment for Connecticut children.

For his greed, corruption, and abject lack of integrity, Diamantis is deserving of a sentence within the advisory Guidelines range of 121 to 151 months of imprisonment.

## I. Introduction and Background

### A. Procedural History

On May 15, 2024, a grand jury in New Haven, Connecticut, charged Diamantis in a 22-count indictment with Extortion by Wrongful Use of Fear and Under Color of Official Right in violation of 18 U.S.C. § 1951 (Counts One and Two), Bribery in Connection with a State Government Receiving Federal Funds in violation of 18 U.S.C. § 666(a)(1)(B) (Counts Three and Four), Conspiracy to Commit Extortion Under Color of Official Right in violation of 18 U.S.C. § 1951 (Counts Five and Six), Conspiracy to Give and Receive Bribes in Connection with a State Government Receiving Federal Funds in violation of 18 U.S.C. §§ 371, 666(a)(1)(B) and 666(a)(2) (Counts Seven and Eight), and False Statements in violation of 18 U.S.C. § 1001(a)(2) (Counts 9–22). Diamantis surrendered voluntarily on May 16, 2024. He was presented on the same day before United States Magistrate Judge Thomas O. Farrish in Hartford, was arraigned on the indictment, and was ordered released on a secured $500,000 surety bond. Diamantis has been at liberty since that time.

On October 22, 2025, following a two-week jury trial, Diamantis was convicted on counts 1–13 and 15–22 of the Indictment. (Count 14 was voluntarily dismissed by the Government prior to the close of evidence.)

B. Summary of the Facts

A fulsome summary of the offense conduct is set out in the PSR at ¶¶ 8–49, which the Government incorporates by reference and substantially restates or summarizes here. The PSR and this summary draws largely from the trial record in this matter.

Background

At all relevant times, Diamantis was a resident of Farmington, Connecticut. Diamantis was a licensed lawyer since 1988 and a former State Representative for the 79th District. From at least May 2015 through October 2021, Diamantis was an employee of the State of Connecticut; specifically, he was the director of the State of Connecticut's Office of School Construction Grants and Review ("OSCGR"), the State agency responsible for the grant administration on all Connecticut public school construction projects seeking State funding. From November 2019 through October 2021, Diamantis was also employed as the deputy secretary of the State of Connecticut's Office of Policy and Management, the State agency responsible for policy, planning, budgeting, and management of State government. Prior to that time, OSCGR was part of the Connecticut Department of Administrative Services. PSR ¶ 9.

Between 2018 and 2021, Diamantis engaged in overlapping schemes and conspiracies to commit extortion and bribery through his official position. First, he used his position to solicit and accept bribes, and to obtain payments under color of official right and by inducing fear of economic loss, from Acranom in connection with a dispute over Acranom's work on a construction project at Weaver High School in Hartford (the "Weaver Project"), Acranom's bid for additional work on

the Weaver Project, and Acranom's bid on a project to rebuild Birch Grove Primary School in Tolland (the "Birch Grove Project"). Second, Diamantis similarly used his position to solicit and accept bribes, and to obtain payments under color of official right and by inducing fear of economic loss, from CAP in connection with bids for consulting or owner's representative work on the Birch Grove Project, a project at Hartford's Bulkeley High School (the "Bulkley Project"), and work for the City of New Britain's Board of Education. Then, during three different investigative interviews with federal law enforcement agents in August, September, and December 2023, Diamantis made materially false statements regarding his criminal conduct. PSR ¶ 10.

The Acranom Extortion and Bribery Scheme

Acranom was a masonry contractor located in Middlefield, Connecticut. Salvatore "Sal" Monarca was the President and owner of Acranom and John F. Duffy was the Vice President. Diamantis was previously married to Duffy's sister, and Duffy continued to refer to Diamantis as "Uncle." Tr. 59–60. PSR ¶ 11.

Acranom, through Duffy and Monarca, paid bribes to Diamantis from at least 2018 through 2021 in exchange for Diamantis's assistance in resolving a dispute over Acranom's work on Phase 2 of the Weaver Project, winning a bid for masonry work on Phase 4 of the Weaver Project, and winning the masonry work on the Birch Grove Project. In addition to soliciting and receiving these bribes in exchange for his official actions on Acranom's behalf, Diamantis also often secured payment from Acranom by threatening implicitly and explicitly to hurt Acranom's business on the Weaver Project, the Birch Grove Project, and its business generally. PSR ¶ 12.

Both Duffy and Monarca testified to the pattern through which they would pay Diamantis. Monarca would write a check to Duffy or himself from an Acranom account, then he or Duffy would take the check to a bank branch, cash it, and provide the cash to Diamantis in person. The

Government presented a summary chart showing non-payroll checks written from Acranom to Monarca or Duffy, and cash deposits into Diamantis's account, from December 21, 2017 until December 17, 2021. PSR ¶ 13.

*Weaver Phase 2*

The first matter proven at trial wherein Diamantis assisted Acranom in exchange for payment was related to a dispute over Acranom's work on Phase 2 of the Weaver Project. Tr. 85. By way of background, in or around 2015, the City of Hartford started a renovation project at Weaver High School. The "owner" of the project was the Hartford Schools Building Committee ("HSBC"), which acted on behalf of the City of Hartford. A joint venture called Arcadis O&G was the program manager for the City of Hartford, meaning it managed school construction projects for the city, including the Weaver Project. Jack Butkus was the program director and Sal Salafia was the deputy program manager for Arcadis O&G's Hartford schools program; they acted as the owner's representative on behalf of the HSBC on various school construction projects, including Weaver. The construction manager was a joint venture called Newfield Downes, led by senior project manager Brian Ouelette, which was responsible for hiring subcontractors on the Weaver Project. PSR ¶ 14.

The Weaver Project was divided into four phases. The entire Weaver Project cost more than $100 million, with 95% of the funding provided through state grants administered by OSCGR and supervised by Diamantis. PSR ¶ 15.

In August 2017, Acranom was selected as the masonry subcontractor for Phase 2 of the Weaver Project. Under that contract, Acranom was to be paid approximately $4.09 million for masonry work. PSR ¶ 16.

In 2018, disputes arose over Acranom's work on Phase 2. Beginning in March 2018, Newfield Downes complained about the quality of Acranom's work on Phase 2. In August 2018, Acranom submitted a claim to Newfield Downes seeking compensation for unanticipated expenses, including those caused by delay in the Weaver construction schedule. Acranom disputed Newfield Downes' complaints, and Newfield Downes disputed Acranom's delay claim. Those disputes continued for almost two years. PSR ¶ 17.

Acranom sought Diamantis's assistance to maximize its claim compensation and minimize its repair work, in exchange for bribes. On August 8, 2018, in connection with Acranom's delay claim, Duffy predicted to Monarca that Diamantis would "come down on" the Weaver Project leaders "big time." Duffy explained that he was bragging to Monarca that Diamantis would intercede on Acranom's behalf because Acranom "had been paying him." Two weeks later there was a meeting to discuss the claim, following which Diamantis asked for a meeting with Duffy and Monarca, where they would pay Diamantis to exert his influence over the dispute to benefit Acranom. In fact, on August 24, 2018, bank records showed a $5,000 check written from Acranom to Monarca, cashed by Duffy, and then a $2,000 cash deposit into Diamantis's account on August 27. Several months later, when Monarca complained to Duffy that "[w]e paid [Diamantis] 35k" but "[w]e got 0," Duffy responded that, among other things, "[w]ithout him we wouldn't be at weaver 2." PSR ¶ 18.

Acranom continued to pay Diamantis for his assistance in resolving the Weaver Phase 2 dispute, both on its own and in combination with Diamantis's assistance on other projects discussed below. For example, on September 28, 2018, records showed that Duffy cashed an Acranom check for $2,000, and Diamantis deposited $3,000 in cash four days later. Similarly, on

December 6, 2018, Monarca cashed a $5,000 Acranom check, and then, over the following four days, Diamantis deposited a total of $2,700 in cash. PSR ¶ 19.

In August 2019, while Duffy was responding to Diamantis's complaints about Monarca not paying him quickly enough in connection with the Birch Grove Project, Duffy noted that Monarca would want Diamantis to resolve the Weaver Phase 2 dispute in Acranom's favor. As Duffy wrote, Monarca's agreement to pay Diamantis would depend on whether Diamantis would "confirm you have his back on weaver 250,000 we are at now." Duffy described Diamantis's strategy for helping Acranom, writing, "I told [Monarca] you have weaver covered but you have to let process run [then] you step in to the city and tell them to resolve." Diamantis then agreed with Duffy's characterization of the plan, but said "I won't do a thing til he does rt thing for tolland [i.e., the Birch Grove Project]." PSR ¶ 20.

In fact, Diamantis did successfully push the Weaver Phase 2 dispute to a favorable resolution for Acranom. On November 10, 2019, Duffy directed Diamantis to "get a hold of Sal Salafia make sure he accepts everything and we get that $300 is Big." Duffy explained that he asked the defendant to talk to Arcadis O&G's Salafia because he "as an owner's rep, in my opinion, would be the one giving the final approval to the settlement of the claim." Duffy expected Diamantis to follow his instructions because Acranom was paying him. After further dispute, on February 21, 2020, Diamantis emailed representatives from Acranom, Newfield Downes, and the City of Hartford and declared, "I want this resolved. Let's meet if need all of us some of us at oscgr." A meeting was held at OSCGR offices with Diamantis on February 26, 2020. On or around March 19, 2020, Newfield Downes reported to Acranom that the City of Hartford had approved a $300,000 payment to Acranom to settle the claims, whereupon Duffy texted Diamantis "My guy [Monarca] said u da Champ." On the same day, the evidence shows that Acranom paid

Diamantis for his influence; Monarca cashed an Acranom check for $5,540, and Diamantis deposited $4,900 in cash. PSR ¶ 21.

*Weaver Phase 4*

Even as the dispute over Acranom's work on Weaver Phase 2 was ongoing, Diamantis also provided assistance, in exchange for payment, to ensure the success of Acranom's bid for the masonry contract on Phase 4 of the Weaver Project. Acranom was the low bidder for Phase 4, but the City of Hartford's representatives did not initially want to award the masonry contract to Acranom because of its unresolved claim on Phase 2 and concerns about its work product on Phase 2. PSR ¶ 22.

Notwithstanding these concerns, Diamantis used his influence to intercede on Acranom's behalf to ensure Acranom would be awarded the masonry contract on Weaver Phase 4. On January 16, 2019, referring to the impending decision from the HSBC on the selection of a mason for Phase 4, Duffy wrote to Diamantis, "Please make sure That vote tonight goes to us for Phase 4. Talk to your guy." Diamantis confirmed "I did already." The following day, Duffy reported to Monarca, "We should be good Phase 4 Per uncle [Diamantis]." Duffy continued: "Brian Ouelette and the city was never going to give us phase 4 Only for our Uncle [thumbs-up emoji]." Butkus, the Arcadis O&G program director, wrote on January 25, 2019, to others on the project team explaining that Diamantis had essentially forced the project team to select Acranom. PSR ¶ 23.

On January 25, 2019, Newfield Downes wrote to Monarca informing him of the decision to enter into a $3.034 million contract with Acranom for Weaver Phase 4. On the same day, after Duffy texted Diamantis to thank him, Diamantis took credit for having swung the decision in Acranom's favor, writing: "It took a lot of work…Trust me…C a called me lots of calls." "C a" was a reference, in this case, to Salafia of Arcadis O&G. PSR ¶ 24.

Within a week of Diamantis helping Acranom secure the Weaver Phase 4 contract, Diamantis asked for payment for exerting his influence. On February 1, 2019, Diamantis wrote to Duffy and Monarca: "Just so you both I am very good at what I do and always do what I say. Johnny knows. And I always usually work at 5 percent of total just FYI." Duffy understood this to mean that Diamantis was "looking for payment off of Acranom being awarded Phase 4 Weaver." Five days later, on February 6, 2019, Diamantis wrote to Duffy and Monarca, "Lunch tomorrow noon capital grille sharp," meaning Diamantis was "looking to meet and looking for a payment for weaver Phase 4." When Monarca and Duffy failed to agree on a time and place to meet, Diamantis complained, "I always lived in two way street I always keep my word and do what I say. Clearly this seems one way." The evidence showed that Mr. Diamantis was eventually paid for his assistance on Weaver Phase 4; as discussed above, by April 26, 2019, when Monarca complained that he and Duffy had already "paid [Diamantis] 35k," and "as of to day. We got 0," Duffy responded "[w]ithout him we wouldn't be at weaver 2 or got the contract Weaver 4." PSR ¶ 25.

*Birch Grove*

At the same time Diamantis was asking for money for assisting Acranom in winning work on Weaver Phase 4, and was continuing to push the City of Hartford to resolve the Weaver Phase 2 dispute in Acranom's favor, Diamantis put Acranom up for another job with the expectation that Duffy and Monarca would once again compensate him for using his influence. Specifically, in April 2019, Diamantis reached out to Duffy regarding masonry work at a project to rebuild the Birch Grove Primary School in Tolland, Connecticut. Because this was an emergency project, there was no competitive bid; Diamantis explained to Duffy that "if Acranom wanted to do the masonry work, that he would see to it that [Acranom] would be involved as the mason." PSR ¶ 26.

Duffy and Monarca agreed to bid to the general contractor, D'Amato Construction, for the masonry work on the Birch Grove Project. Diamantis was involved directly in this process, pushing Acranom to get its bid in quickly. On April 15, 2019, Duffy wrote to Monarca, "Uncle wanted it last week now it has to be tomorrow." Monarca testified, "I never did emergency job before and I never, ever dealt with anybody that high level ever in the state for any job." In less than a month, Acranom was "selected" as the masonry contractor for the Birch Grove Project, as Diamantis informed Duffy even before D'Amato could call. On May 7, 2019, Acranom signed an initial $2.55 million contract to perform the Birch Grove Project masonry work. This was a "placeholder" contract, pending project revisions. PSR ¶ 27.

Even though the initial contract was just a placeholder, and Acranom had not yet done any masonry work or been paid any money for the Birch Grove Project, Diamantis immediately began to demand money in exchange for his influence in getting Acranom the work. On the same day the placeholder contract was signed, Diamantis wrote to Duffy, "I'm asking for reasonable number being on the team had value and it's not zero 50 is fair zero is an insult to my character for you I do 44 not a penny less and tomorrow as agreed other than that tell him I am out." Duffy pushed back on Diamantis's demand, writing, "Uncle you not handling this right. … The contract sum is not finalized as no one knows that is yet The deal was the contract sum plus the rate." Duffy testified that "the rate was an agreed lump sum of $70,000" in exchange for Diamantis getting Acranom the Birch Grove Project contract. PSR ¶ 28.

Over the ensuing several months, Diamantis repeatedly demanded money in exchange for having helped Acranom obtain the Weaver Phase 4 masonry contract, providing ongoing assistance on getting Acranom a favorable final contract on the Birch Grove Project, and resolving

the ongoing Weaver Phase 2 dispute. His demands often included claims about his own financial need. For example:

a. May 18, 2019: Diamantis left a voicemail for Monarca, saying, "So, I had to eliminate Juliana's tuition account and not pay the last payment on the wedding to keep my end, to keep my word intact, because I said the minute the other contract's in place, I'll take care of it because they're gonna take care of it. … So, the part that, you know, till we have the final plans, I didn't ask for the maximum, I asked for the minimum of what we bid, so that's more than reasonable. I even asked for less than that, I asked for forty, even less than that."

b. June 13, 2019: Diamantis wrote to Duffy, "Did you see your number went up 200 to where you were with 85000 sf building… I've done my part I need action."

c. June 14, 2019: Diamantis wrote to Duffy, "Just approved 60k in change orders weaver for you guys…Plus rain labor…And I can't pay my mortgage…Due today."

d. July 2, 2019: Diamantis wrote to Duffy, "Johnny every one of my creditors reduced my limits because of me trying to be trusting and hooking up Acranom. I have ruined my credit because I put up my 20. And believed I would get mine when you got yours which was the deal. Please ask him to give me 20 he can keep the rest and the job but I never want to hear the company name again."

e. August 9, 2019: In response to Duffy telling Diamantis that "[l]atest signed contract number is close to our original bid," Diamantis bragged, "Yes it is…I made sure," and then wrote, "I need that coin Johnny like last month."

f. August 10, 2019: Diamantis wrote to Duffy, "I text him [Monarca,] I call him[,] I text him and call again and now I feel like a beggar for what he should have

thankfully gave especially when we built it in it's like he's pissing on me and making me crawl."

g. November 13, 2019: After discussions about changes to Acranom's Birch Grove contract, Diamantis wrote, "Doesn't matter end of day you gone add 70."

PSR ¶ 29.

Additionally, on several occasions, Diamantis threatened Acranom's business if it did not live up to the agreement to pay Diamantis in exchange for his official actions. For example:

a. July 2, 2019: Diamantis wrote to Duffy, "My credit lines have been reduced before [my daughter's] wedding by 30k and my cash flow is zero because of that liar [Monarca]. And if you can't get me my 20 then he can shove that up his ass too…I better never see him at tolland [Birch Grove]…or anywhere."

b. August 10, 2019: Diamantis wrote to Duffy, "So here's what I will do. I will wait til Monday for him [Monarca] to give you 40. If not then I think D'Amato needs a new mason for tolland [Birch Grove] then he will see how real the job was. I'm not a beggar Johnny I'm your brother uncle call me what you wish. But I'm no beggar and did my part."

c. August 10, 2019: Diamantis wrote to Duffy, "Bottom line have him give you 40 for Monday or he's out."

d. August 11, 2019: Diamantis wrote to Duffy after discussing a meeting between Duffy, Monarca, and Diamantis, "Will he have the present with him…Please make sure Johnny I'm not playing his game. The demo starts in two weeks…I be damned…Tuesday there will be a new mason…Thanks Johnny for your help…Make sure he has it though he has no clue who I am and my back to the wall."

e. February 28, 2020: Diamantis, in reference to his demand for compensation for using his influence to secure a favorable resolution for Acranom in its dispute with Hartford over Weaver Phase 2, wrote: "I give him [Monarca] til tomorrow then I tell Hartford I made a mistake…In the math."

PSR ¶ 30.

Although Acranom did not pay Diamantis every time he made a demand or threat—indeed, Diamantis's view that Monarca was dragging his feet often spurred his aggressive tone—Duffy and Monarca each frequently met with Diamantis to pay him. For example:

a. August 20, 2019: After an escalating series of demands and threats from Diamantis, some of which are set out above, Monarca wrote an Acranom check for $10,000 to Duffy, Duffy cashed that check in Middletown, Duffy met Diamantis at the Capital Grille in Hartford and provided him with cash, and Diamantis deposited at least $7,500 in cash into his personal account.

b. October 11, 2019: Duffy arranged to meet Diamantis at 5:15 p.m. at a TD Bank in Middletown to pay him, Monarca wrote an Acranom check to Duffy for $10,000, which Duffy cashed, Duffy provided cash—he believes $5,000—from that check to Diamantis, and Diamantis deposited cash into his personal account.

PSR ¶ 31.

Early in 2020, the masonry contract for the Birch Grove Project was being finalized. On January 3, 2020, in response to Duffy asking about a revised Birch Grove contract, Diamantis wrote, "I will check in now…It will be coming any moment," and then demanded, "So whatever your boss can do sooner than later is greatly appreciated." Duffy then promised that payments

would come starting February 1st. In fact, a final $2.88 million contract between Acranom and D'Amato was signed that same date, January 3, 2020. PSR ¶ 32.

After the Birch Grove Project masonry contract was finalized, Diamantis immediately sought payment, writing to Duffy on January 4, 2020, the day after the contract signing, "Let's start 15th this month and each there after bro." In fact, Acranom made a payment to Diamantis on January 15, 2020. Duffy wrote on that day, "5 pm today up the street…Birthday too. Ok ???...or Middletown basement restaurant across from courthouse. ?!! 5 pm. ??" Diamantis replied: "5 pm cap grill with card." And Duffy responded, "OK happy birthday." According to Duffy, "birthday" was a code he used for a payment, and he understood Diamantis to be using a similar code equating "card" with a payment. Bank records show that Monarca cashed an Acranom check on January 15, 2020 for $5,000, and Diamantis deposited $3,000 in cash a day later. PSR ¶ 33.

In accord with their agreement that Acranom would pay Diamantis for his influence on the Weaver Project and the Birch Grove Project, Diamantis demanded—and Monarca and Duffy paid—several other bribes in the ensuing months. For example:

a. January 21, 2020: After Duffy wrote that "you can text my guy [Monarca] I think 5 p.m. is better," Diamantis responded, "I did…Just now tell him check his phone." On the same day, Monarca wrote an Acranom check to himself for $6,000, which he cashed in Middletown. Diamantis deposited $1,500 cash on January 21 and $3,500 on January 22 into his personal account.

b. February 29, 2020: After Diamantis complained that Monarca was not keeping to their payment schedule, Duffy wrote, "u had deal monthly[,] He changed it. W .T f. Make sure u keep track of its 62. 1/2. Remember?" Diamantis responded, "Yes on top of what you had given me already." Duffy encouraged Diamantis to make sure

Monarca kept to their deal, writing, "Just make sure u keep the score. U should tell him to go back on monthly. Jan. Feb. mar. April. All done. 15 15 15 17.5 Remember[.] That was the deal. He changed it. Wtf. Make sure you tracking It."

c. April 15, 2020: Monarca wrote an Acranom check to himself for $6,000, which he cashed in Middletown. Diamantis deposited $3,000 in cash the next day.

d. April 18, 2020: Duffy wrote to Diamantis, "My guy says you almost All squared up soon. … 20 left." Later that day Duffy wrote, "F Y I My guy said already Fifty[.] That left 12. 1/2. I told you Make sure you keep score[.] Just keeping you informed so you don't lose Score sheet." Diamantis responded, "It is but he's counting the 10 from before[.] We agreed out [sic] number not counting that." And Duffy replied, "OK Stay on your guard."

PSR ¶ 34.

The CAP Extortion and Bribery Scheme

Antonietta Roy founded Construction Advocacy Professionals, LLC ("CAP") in December 2017. CAP was an owner's representative, also known as a construction administrator or project management firm. As an owner's representative or project manager, CAP worked for project owners to provide several forms of assistance, including hiring an architect and construction manager, developing a budget, and helping carry the project through to completion. PSR ¶ 35.

From at least 2019 through 2021, Diamantis solicited, demanded, and received bribes from CAP, paid both from Roy's personal account and directly from CAP, in exchange for Diamantis using his influence to benefit CAP's efforts to obtain work on state-funded school construction projects, including the Birch Grove Project in Tolland, a Bulkeley High School project in Hartford, and projects for the City of New Britain. Diamantis also used his position of power and influence

over state-funded school construction in Connecticut to cause Roy to reasonably fear that CAP would not be able to get any work if she did not accede to Diamantis's demands for money. PSR ¶ 36.

One of the ways in which Roy compensated Diamantis for his influence on CAP's behalf was through hiring his daughter Anastasia for a low-show job at an inflated rate. In approximately March or April 2019, after CAP was awarded its first job, Roy called Diamantis looking for someone who could help her. Diamantis gave Roy two names—his daughter Anastasia, who had no experience, and a professional who was already working in the school construction industry. Roy chose to hire Anastasia despite her lack of experience because Diamantis was "adamant" that Anastaisa would do a good job and needed to pay off her student loans, and because Roy believed she needed to keep Diamantis happy in order to secure work for CAP. Accordingly, Roy entered into an independent contracting agreement with Anastasia on April 15, 2019 that would pay $45 per hour. GX 80. Notably, although Anastasia only asked Roy for $20 per hour, Roy offered to pay $45 out of fear and with Diamantis's prior comments in mind. As Roy explained, "I paid a higher rate because Mr. Diamantis had told me to take care of his daughter. I knew if I had given her a lower rate, I would receive some backlash." Diamantis frequently told Roy to "take care of" his daughter. PSR ¶ 37.

Diamantis's first major assistance to CAP came shortly after Roy hired Anastasia, when Diamantis arranged for CAP to be hired as the owner's representative for the Birch Grove Project, despite the Tolland superintendent's hesitation. Shortly after the Birch Grove Project was approved, Anastasia reported to Diamantis that "Antonietta told me she emailed them to set up a meeting." Diamantis, making clear he expected Anastasia to be rewarded for his assistance to CAP, responded, "They coming tomorrow my place 10[:]30…I told her I expect you get a

percentage bonus I'm told don't worry I got Anastasia." The first Birch Grove contract between CAP and Tolland, related to temporary classrooms, was signed on June 20, 2019 for $70,000. Later, a $460,000 contract, related to the actual construction of the school building, was awarded to CAP on September 19, 2019. PSR ¶ 38.

Roy compensated Diamantis both directly and indirectly through Anastasia during the same period CAP was awarded more than $500,000 in contracts related to the Birch Grove Project. On July 8, 2019, Roy wrote a personal check to Diamantis for $1,000, with the word "Donation" in the memo line. According to Roy, Diamantis claimed the check was for a political donation, but Roy paid because she "had to keep Mr. Diamantis happy or else [she] would not continue to get work." On August 27, 2019, CAP wrote Anastasia three checks—$785 for her July hours, $300 for her August hours, and $500 for a purported "bonus." The "bonus" was a response to Diamantis calling Roy and pressuring her to take care of his daughter, and not a reflection of her view of Anastasia's work. Anastasia texted with Diamantis, who made it clear that bonus was a result of his influence over Roy and in getting CAP the Birch Grove project, telling his daughter there was "more to come." PSR ¶ 39.

Around the same time Diamantis helped CAP get work on the Birch Grove Project, he also "recommended" CAP to New Britain for a contract to help close out prior state-funded projects. As a result, CAP entered into an August 11, 2019 contract, signed on October 11, 2019, with the City of New Britain, even though New Britain already had its own staff that was well qualified to do that work. PSR ¶ 40.

The most substantial work that Diamantis used his influence to obtain for CAP was a $1.769 million contract for construction administrator services on the Bulkley Project. It was solely Diamantis's idea to install a construction administrator on the Bulkeley Project, despite the

fact that those services were already being performed by Arcadis O&G as part of its existing responsibilities as Hartford's school construction program manager. Diamantis made it clear to those associated with the project—including from Arcadis O&G and the HSBC—that he wanted CAP to be selected as the construction administrator. Diamantis informed Roy that CAP should bid on the Bulkeley Project; she was unaware of it prior to his call. PSR ¶ 41.

Even though CAP was not the low-cost bidder, it was selected as the construction administrator for the Bulkeley Project because of Diamantis's influence. Diamantis led those involved with the project to believe that the State of Connecticut would cover the unnecessary costs associated with hiring CAP as a redundant construction administrator. While there was overlap between Arcadis O&G's function and the construction administrator, Diamantis did not want to restrict the scope of Arcadis O&G's work; instead, those involved believed that "[i]t's possible he's willing to spend extra to get his person on board," where "his person" was Roy. Diamantis was directly involved in developing the request for proposals for a construction administrator, even though the State was not a party to the agreement. Even before bids were received, it was understood that CAP would be selected. However, once the bids came in, CAP was about $1 million above the lowest bidder. Even after removing part of its bid, CAP was still substantially higher. CAP was selected nonetheless because of Diamantis's influence. In official documents, Hartford officials claimed that they selected CAP because it was a woman-owned business, but in truth that was just "paper[ing] the file"; the actual reason was Diamantis's influence. Diamantis told Roy that he created the construction administrator position on the Bulkeley Project specifically for CAP. Roy understood that Arcadis O&G was capable of performing CAP's functions, but that Diamantis wanted CAP on the project. On April 29, 2020, CAP entered into a $1.769 million contract for the Bulkley Project with the HSBC. PSR ¶ 42.

Shortly after CAP entered into its Bulkeley Project contract, Roy promoted Anastasia to the position of "Assistant Project Manager." Anastasia was still paid the same $45/hour, but now also received other benefits, such as paid time off and holidays. This contract and its benefits were not a reward for performance; in Roy's view, Anastasia was not a good employee, "wasn't really doing the tasks that [Roy] assigned to her," and "[i]f she was doing them, they were very slow or incomplete." Instead, Roy continued to employ and pay Anastasia to appease Diamantis's frequent demands that Roy "take care of his daughter." PSR ¶ 43.

Over the ensuing months, CAP was paid substantial sums on some of the contracts that Diamantis helped it obtain and, in turn, Roy and CAP paid Diamantis and his daughter. For example:

a. Between May and December 2020, Tolland paid CAP four installments of $18,400 each for its work on the Birch Grove Project.

b. On December 13, 2020, Roy wrote a $1,000 check to Anastasia out of her personal account.

c. On January 4, 2021, Roy wrote a $1,000 check to Diamantis, again from her personal account.

d. Around February 19, 2021, CAP entered into an owner's representation agreement with New Britain for another project for $65,620.

e. On or around March 8, 2021, Hartford wrote a $27,062.50 check to CAP for its work on the Bulkeley Project.

f. On March 17, 2021, Roy wrote a $1,500 check to Diamantis from her personal account.

g. In the summer of 2021, following a demand from Diamantis, Roy paid Diamantis $1,000 cash that he claimed to Roy was for a political donation.

PSR ¶ 44.

Additionally, all during this time, CAP continued to pay Anastasia as an employee; even though Anastasia "wasn't doing anything at all," Roy continued paying Anastasia despite her poor performance because she was trying to keep Diamantis happy. In the fall of 2021, the same day that Roy learned that Diamantis had left his employment with the State and was no longer in a position of power over CAP, she fired Anastasia. PSR ¶ 45.

In total, Roy paid Anastasia $1500 in bonuses and $36,824.25 in wages. While the evidence is that Roy only hired and continued to pay Anastasia because of Diamantis's pressure, and that Anastasia did little actual work, the Court may choose to credit Diamantis the value of Anastasia's bona fide wages, assuming Anastasia did the work she was assigned. In that event, the Court should consider that Roy paid Anastasia $45 per hour, well above market rate, and well above Anastasia's request of $20 per hour, in order to influence Diamantis. Thus, Anastasia's wages were inflated by $25/hour, or 125%. Therefore, the true value of her work was approximately $16,366.33, and the surplus paid as a bribe was $20,457.92. Combining that with her $1,500 in bonuses, the total bribe paid by Roy indirectly to Diamantis through Anastasia was $21,957.92. PSR ¶ 46.

Roy also paid Diamantis a total of $3,500 in checks, GX 600C, and $1,000 in cash. PSR ¶ 47.

Thus, the total amount of direct and indirect bribe payments CAP paid to Diamantis was $26,457.92. PSR ¶ 48.

False Statements

Diamantis was also convicted of 13 counts[1] of making false statements to federal investigators in the course of three interviews. First, he lied to agents during an August 29, 2023 interview at his home. Next, he lied to investigators during an interview at a Starbucks in Bristol, Connecticut. Finally, he lied to investigators at the FBI office in Meriden, Connecticut, on December 8, 2023. The following is a summary of each lie for which the defendant was convicted and some of the evidence in support of its falsity.

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| 9 | August 29, 2023 | Diamantis "didn't recommend" CAP for the construction administrator position on the Birch Grove Project. GX 900B; Tr. 1191–93. | **Tolland School Superintendent Walter Willett:**<br>Q. And why did you pick CAP?<br>A. Recommended highly by Mr. Diamantis.<br>Tr. 693.<br><br>Q. And did the defendant have a preference as to which firm you should hire for construction administration?<br>A. I felt it was CAP.<br>Tr. 714.<br><br>Q. So as a result of your discussions with the defendant, to what extent did you feel you had a choice as to whether or not to hire CAP?<br>A. It's back to the fire scenario. You know, it's on fire and this one is going to get it done. So no, I didn't feel like I had any practical choice.<br>Tr. 715–16.<br><br>**Roy:**<br>Q. Do you have an understanding as to why you were given that job? |

[1] Count 14 was dismissed on the Government's motion prior to the close of evidence. Doc. 95.

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | A. We were going to be the owner's project managers, and Mr. Diamantis had recommended us to be on the project.<br>Tr. 408. |
| 10 | August 29, 2023 | Diamantis "did not help [Roy] get on, get any jobs." GX 900C; Tr. 1193–94. | *See* Count 9 evidence.<br><br>**Salafia:**<br>Q. Was there any company that the defendant pushed for in particular as construction administrator?<br>A. Yes.<br>Q. And what was that?<br>A. CAP, Construction Advocacy Professionals.<br>Tr. 670.<br><br>**Colon:**<br>Q. Why -- what was the principal reason why CAP was selected as the CA, as the construction administrator?<br>A. It was a suggested name by Mr. Kosta, by Kosta, when -- in a meeting prior to the selection of the construction administrator.<br>Tr. 749–50.<br><br>Q. Did, at some point, Mr. Diamantis give you an idea of who he wanted as a construction administrator?<br>A. He mentioned the name which was exceptional in my -- in my experience with him or in meetings I participated in, he had not mentioned any names. But in this case he mentioned the name Antonietta DiBenedetto Roy. Tr. 753.<br><br>Q. You had an understanding prior to that going out as to who the defendant wanted, correct?<br>A. Correct, yes.<br>Q. And who was that?<br>A. Antonietta -- CAP which is -- the principal which is Antonietta DiBenedetto Roy. |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | Tr. 772.<br><br>**Dellaripa:**<br>Q. Going into that meeting on Friday, the 13th, what was the most important thing you knew about Antonietta Roy and her firm CAP?<br>A. Well, I knew that's who Kosta wanted to be the construction administration on the Bulkeley project.<br>Tr. 1118.<br><br>Q. All right. So the fact that it's woman-owned and the fact the size of the firm aren't the real reasons. What is the real reason?<br>A. Kosta wanted CAP to be the CA.<br>Tr. 1124. |
| 11 | August 29, 2023 | When confronted with the statement that "the [Tolland] superintendent said he was pressured to select CAP" as construction administrator (or "CA") on the Birch Grove project, "I didn't care who the CA was, because the CA wasn't going to do anything for me." GX 900D; Tr. 1194–96. | *See* Count 9 Evidence. |
| 12 | August 29, 2023 | Diamantis "did not recommend D'Amato" for the Birch Grove project. GX 900E; GX 900F; Tr. 1196–97. | **Willett:**<br>Q. If you didn't invite D'Amato Construction there, who did you understand had invited them?<br>A. Mr. Diamantis.<br>Tr. 705.<br><br>Q. But who picked D'Amato Construction for this project?<br>A. Well, I'd say Mr. Diamantis made it clear D'Amato was the one to get us through the woods on this without costing the town any more money or losing us funding or potentially extending into a timeline longer than we could have children, you know, in the building or in a portable.<br>Tr. 708–09. |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| 13 | September 19, 2023 | Diamantis did not "encourage [Roy] to reach out to [his daughter] for a job" at CAP. GX 901B; Tr. 1201. | **Roy:**<br>Q. Okay. And how did you find out about his daughter?<br>A. When I called Mr. Diamantis, I had asked him if he knew anybody in the construction industry who had any experience, I was looking for some help. He had mentioned his daughter and then gave me another young lady's name.<br>Tr. 394.<br><br>A. Mr. Diamantis was quite adamant that his daughter was going to do a great job and work for me. He was pushing that she needed a part-time job and to pay off college loans.<br>Tr. 396. |
| 15 | December 8, 2023 | Diamantis never helped any business obtain work related to school construction projects. Tr. 1014–15. | *See* Counts 9, 10, 12 Evidence.<br><br>When Monarca complained to Duffy that "[w]e paid [Diamantis] 35k" but "[w]e got 0," and Duffy responded, "[w]ithout him we wouldn't be at weaver 2 or got the contract Weaver 4." GX 18 at 2–3.<br><br>Duffy wrote to Diamantis, "Please make sure That vote tonight goes to us for [Weaver] Phase 4. Talk to your guy." GX 8 at 5. Diamantis then confirmed, "I did already." GX 8 at 6.<br><br>Diamantis took credit for having swung the decision on Weaver Phase 4 in Acranom's favor, writing, "It took a lot of work Trust me[.]C a called me lots of calls." GX 10 at 3. |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | Butkus wrote to the Weaver Project team: "[A]ttempts to convince those with the 'power of the purse' at OSCGR that the risks to quality of product and possibly to project schedule outweigh the additional cost of awarding the Phase 4 work to the second lowest bidder, as the 'lowest qualified, responsive and responsible' bidder, have been rebuffed." GX 122.<br><br>**Butkus, interpreting his comment in GX 122:**<br>"The attempts to convince [Diamantis] that the cost of the second lowest bidder versus the benefit of having somebody who had—presumably starting off with a clean slate and better quality than with the difficulties we'd had with Acranom. We were basically trying to sell the cost-benefit analysis and we were turned down." Tr. 814.<br><br>**Duffy:**<br>"I received a call from Kosta explaining to me that this Birch Grove School was crumbling and was going to be demolished and rebuilt, and if Acranom wanted to do the masonry work, that he would see to it that we would be involved as the mason." Tr. 142. |
| 16 | December 8, 2023 | Diamantis was not involved in the hiring process for general contractor, construction manager, architect, or subcontractor on any school construction projects, including at Birch Grove, Bulkeley, and Weaver. Tr. 1015–17. | *See* Counts 9–15 Evidence. |
| 17 | December 8, 2023 | The OSCGR staff, rather than Diamantis, suggested Tolland hire a construction administrator for the Birch Grove project. Tr. 1017–18. | **Willett:**<br>Q. … So whose idea was it to hire a construction administrator on Birch Grove?<br>A. Mr. Diamantis. The situation was complex, a lot of things had to happen very quickly. And essentially, it was |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | without a construction administrator, things would get fouled up.<br>Q. Is that what he told you?<br>A. Yes.<br>Tr. 713. |
| 18 | December 8, 2023 | Tolland's Superintendent of Schools recommended D'Amato Construction for the Birch Grove project. Tr. 1018–19. | *See* Count 12 Evidence. |
| 19 | December 8, 2023 | Diamantis did not suggest CAP as a construction administrator on the Bulkeley project. Tr. 1019–20. | *See* Count 10 Evidence. |
| 20 | December 8, 2023 | Acranom did not receive special treatment on the Weaver project. Tr. 1020–21. | *See* Count 15 Evidence. |
| 21 | December 8, 2023 | Payments from Roy to Diamantis were for legal work he performed for CAP, rather than donations or bribes. Tr. 1021–22. | **Roy:**<br>Q. Other than acceding to the defendant's requests for payment, did you have any other personal business with the defendant that you were paying him for?<br>A. No.<br>Q. Do you have a legal services agreement with him where you were paying him $1500?<br>A. No.<br>Q. Why were you paying the defendant over and over again?<br>A. He was consistently calling me for money.<br>Q. And why did you give it to him then?<br>A. Because I was afraid of losing work.<br>Tr. 458. |
| 22 | December 8, 2023 | Diamantis did not receive payment from any business working on the Birch Grove, Bulkeley, or Weaver projects, including Acranom. Tr. 1022–25. | **Duffy:**<br>Q. … Did you pay him for his assistance in helping to resolve Weaver Phase 2?<br>A. Yes.<br>Tr. 85. |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | Q. Okay. Did the defendant provide you with assistance in obtaining the contract on Phase 4 and resolving the issues you just described?<br>A. Yes.<br>Q. And did Acranom again pay the defendant for that assistance?<br>A. Yes.<br>Tr. 86–87<br><br>Q. And then it says, "The deal was the contract sum plus the rate." What's the deal?<br>A. That was the agreement that we were going to pay him "X" amount of dollars for the Tolland school.<br>Q. Pay who?<br>A. Acranom was going to pay Kosta.<br>Q. For what?<br>A. For getting the job.<br>Tr. 155<br><br>Q. Did you meet the defendant at the Capital Grille in Hartford?<br>A. Yes.<br>Q. Why did you meet him?<br>A. I meet him to give him a payment.<br>Tr. 209.<br><br>**Roy:**<br>Q. And what was the nature of those conversations about his interest in having you on the [Bulkeley] project?<br>A. Mr. Diamantis had told me he had created the construction administrator position on that project.<br>Q. For what?<br>A. For us to be on it.<br>Tr. 436.<br><br>Q. And now this [contract] that you signed with Hartford in April of 2020, correct?<br>A. That is correct.<br>Q. In these periods of time, in other words, 2019 and 2020, were you continuing to get requests from Mr. Diamantis for money? |

| Count | Date | Substance of False Statement | Sample Evidence |
|---|---|---|---|
| | | | A. Yes. …<br>Q. And were there other times when you did give him money?<br>A. Yes.<br>Tr. 440.<br><br>GX 600B and GX 600C: Summarizing payments from Roy or CAP to Diamantis or his daughter. |

PSR ¶ 49.

II. Sentencing Guidelines

The Government agrees with the Probation Office's Sentencing Guidelines calculation, PSR ¶¶ 50–104, which is also not challenged by Diamantis, *see* Def. Mem. 4.

**Group One**: All substantive bribery-related counts are grouped together pursuant to U.S.S.G. § 3D1.2(d), as they are all covered by § 2C1.1. That includes the parts of Counts One and Two charging extortion under color of official right and Counts Three and Four charging bribery. The conspiracy counts—Counts Five and Six charging conspiracy to commit extortion under color of official right and Counts Seven and Eight charging conspiracy to commit bribery—are likewise grouped with the substantive offenses. U.S.S.G. § 3D1.2 cmt. n.6. Moreover, the offense level for a calculation under the conspiracy guideline, § 2X1.1, will be the same as under § 2C1.1 because none of the special circumstances under § 2X1.1(b) apply. And this group would also include the false statements convictions, pursuant to § 3D1.2(c) and § 3C1.1 cmt. n.8. The calculation for this group is as follows:

a) The base offense level is 14 because Diamantis was a public official. U.S.S.G. § 2C1.1(a)(1).

b) Two (2) levels are added because the offense involved more than one bribe. U.S.S.G. § 2C1.1(b)(1).

c) Eight (8) levels are added because the amount of the payments was greater than $95,000. U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(E).

d) Four (4) levels are added because the offense involved a "public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3).

e) Two (2) levels are added because Diamantis "was an organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1.

f) Two (2) levels are added pursuant to § 3C1.1 because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and … the obstructive conduct related to … the defendant's offense of conviction and any relevant conduct." This enhancement is based both on Diamantis's false statements as well as his perjured testimony. PSR ¶¶ 55–56.

g) The total offense level for Group One is thus 32.

**Group Two:** This covers the part of the defendant's conviction of Count One that charges extortion by wrongful use of fear as to Acranom. PSR ¶¶ 85–90.

a) The base offense level is 18. U.S.S.G. § 2B3.2, cmt. n. 2, 3.

b) Two (2) levels are added under § 2B3.2(b)(2) and § 2B3.1(b)(7) because the amount demanded was greater than $95,000.

c) Two (2) levels are added pursuant to § 3C1.1 because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and …

the obstructive conduct related to … the defendant's offense of conviction and any relevant conduct."

d) The total offense level for Groups Two is thus 22.

**Group 3:** This covers the part of the defendant's conviction of Count One that charges extortion by wrongful use of fear as to Acranom. PSR ¶¶ 85–90.

a) The base offense level is 18. U.S.S.G. § 2B3.2, cmt. n. 2, 3.

b) One (1) level is added under § 2B3.2(b)(2) and § 2B3.1(b)(7) because the amount demanded was greater than $20,000 but less than $95,000.

c) Two (2) levels are added pursuant to § 3C1.1 because "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and … the obstructive conduct related to … the defendant's offense of conviction and any relevant conduct."

d) The total offense level for Groups Three is thus 21.

**Grouping**: Applying § 3D1.4, because each of Groups Two and Three is 9 or more levels less serious than Group One, they do not increase the applicable offense level.

Diamantis is in Criminal History Category I. The Zero-Point offender reduction does not apply because of the aggravated role adjustment. U.S.S.G. § 4C1.1(a)(10). An offense level of 32 with a Criminal History Category I results in an advisory range of 121 to 151 months imprisonment and a $35,000 to $350,000 fine.

III. Sentencing Factors

Consideration of the Guidelines and the statutory factors in 18 U.S.C. § 3553(a) demonstrate that Diamantis's crimes warrant a Guidelines term of imprisonment.

A. Seriousness of the Offense, Respect for the Law, and Just Punishment

By far the most significant consideration that calls for a substantial punishment in this case is the seriousness of the offense. Diamantis's principal crime was a years-long, brazen breach of public trust by a senior state official who used his government office to line his own pockets by extorting businesspeople bidding to provide valuable services to state taxpayers on multimillion-dollar school construction contracts. Several factors in particular weigh in favor of a substantial prison sentence.

*First*, Diamantis's crime is serious because of its persistence and sheer duration. This was not a one-off error in judgment—which, in any event, would have been very serious for a senior state official exploiting his office for personal gain. Instead, Diamantis persevered over more than three years and through countless text messages, phone calls, and meetings to demand money in return for the economic favors he offered and delivered to both CAP and Acranom. The PSR summarizes dozens of instances where Diamantis harassed Duffy and Monarca to pay him for helping Acranom keep or obtain state contracts. Similarly, Antonietta Roy testified to the "constant pressure from the phone calls to take care of my daughter," Tr. 444, that ultimately compelled her to pay Diamantis's daughter undeserved salary and bonuses in order to compensate Diamantis for his assistance and prevent CAP from losing work. Ms. Roy also explained that Diamantis called at least once a month asking for money for himself. Tr. 440.

*Second*, Diamantis's crime was a fundamental betrayal of trust placed in him by the State of Connecticut. He oversaw the administration of hundreds of millions of dollars in state taxpayer

money that was earmarked to fund school construction. *See*, e.g., Tr. 754–55, 1372–73, 1499. Diamantis's official position vested him with almost unfettered power to dictate how that taxpayer money would be spent, with the expectation that he would wield his power in the public interest. Instead, he chose to line his own pockets, knowing it would come at the expense of the taxpayers and the public fisc he was duty-bound to protect. Diamantis did not just solicit a $70,000 bribe from Acranom in exchange for the Birch Grove project, but also explicitly contemplated that Acranom would pass that cost onto taxpayers by adding $70,000 into the amount being billed to the project and reimbursed by the state. *See* GX 308 ("Doesn't matter end of day you gone add 70."); Tr. 238 (Duffy testifying they would add the $70,000 to the final bid amount); Tr. 941 (Monarca: "The real deal was that Kosta told John to put 70,000 on the job and don't worry about how big the masonry job was."). Similarly, he engineered CAP's hiring on the Bulkeley Project, costing the state $1.769 million, despite the professionals' consensus that CAP's role was duplicative of the more experienced Arcadis O&G which was already on the job. PSR ¶ 41. Making matters worse, Diamantis forced the choice of CAP despite the fact that it was not even the low-cost bidder for the unnecessary position. PSR ¶ 42.

*Third*, the defendant's crime exploited and corrupted a basic state obligation to provide equal access to education across the state, regardless of a town or city's economic resources. Without question, the onus to build schools and educate children falls to the states and, generally, the municipalities within those states. Historically the principal source of school funding has been the municipal property tax. However, the Connecticut Supreme Court decided decades ago that a system reliant "primarily on a local property tax base without regard to the disparity in the financial ability of the towns to finance an educational program and with no significant equalizing state support," could not pass muster under the state constitution. *Horton v. Meskill*, 172 Conn. 615,

649–50 (1977). As a result, and as Diamantis himself testified to at trial, *see* Tr. 1331–32, Connecticut has developed a system that requires the state to help pay for construction and renovation at a substantially higher rate, up to 80%, in poorer towns and cities. That rate was, from time to time, increased beyond that 80% by legislation. For example, the rate of reimbursement for the Birch Grove emergency project was 89% for the school and 100% for portable classrooms, Tr. 725, and Hartford received 95% for its major projects between 2018 and 2021, Tr. 665. Diamantis, as the head of OSCGR, became the steward of those state funds and the gatekeeper for municipalities looking to build or renovate schools. *See*, *e.g.*, Tr. 389–90, 816. On top of that, there were certain circumstances, like the emergency project at Birch Grove, that afforded him even more autonomy in deciding how to spend state funds; because there was no competitive bidding, Diamantis was able to dictate who was awarded critical contracts. *See*, *e.g.*, Tr. 142. In short, Connecticut's school construction funding system left less-affluent districts and those otherwise in urgent need vulnerable to Diamantis's corrupt schemes. Plainly, it was no accident that he targeted schools in poorer districts and under emergency conditions—that was where the state money was.

*Fourth*, Diamantis's exploitation of the poorer and most vulnerable districts meant that those districts would be disproportionately subjected to contractors hired based on whether they were paying Diamantis, rather than purely for the quality and price of their work. For example, he forced Hartford to hire Acranom for Phase IV of the Weaver Project even though Hartford's project team was in agreement that Acranom's work on Phase II was so shoddy that they should not be given new work. Tr. 569–70 ("the quality of work was so bad that a lot of work had to be redone which takes time and affects other trades"), 619–21, 810–15; GX122. Because Diamantis had complete authority over whether an expense would be reimbursed, Hartford had no choice but

to succumb to pressure from him over whom to award the contract. Tr. 1110. Thus, the students of Hartford ended up with shoddy masonry because Diamantis was extorting money from the mason.

*Fifth*, Diamantis took advantage of and corrupted contractors looking to obtain work on Connecticut schools. When he first approached Roy for payment, Diamantis knew that she and CAP were new to the school construction industry and that Roy looked to him for advice and guidance. Diamantis exploited a massive power imbalance between himself and Roy to "create[] an atmosphere of fear," Tr. 504, allowing him to solicit money for himself and his daughter, and causing Roy to acquiesce because Diamantis controlled the spigot of school construction money in Connecticut. While Duffy and Monarca were industry veterans, their relationship with Diamantis was likewise imbalanced, in that they knew he was the gatekeeper to school construction work. As with Roy, Diamantis harassed Duffy and Monarca for money, repeatedly making it clear that he expected to paid to give them work. *See*, *e.g.*, PSR ¶¶ 20–21, 25, 28–29. Diamantis did not just solicit bribes from Acranom, he aggressively threatened to pull business from Acranom when he felt he was not paid on time. PSR ¶ 30.

*Sixth*, the seriousness of the crime is exacerbated by the willfulness Diamantis displayed throughout his scheme. As the trial made obvious, Diamantis—an attorney who had practiced criminal law—knew that what he was doing was unethical and illegal. In his dealings with Acranom, he and Duffy repeatedly referred to bribes using codes like "birthday card, keep the score, pars and birdies and … pints." Tr. 267; *see also* Tr. 250 (Duffy explaining that he used the code "birthday" in order to "be discreet and not reveal it in written text"). In the course of texting about the bribes he believed Acranom owed, Diamantis told Duffy to "erase this shit." GX 34 at 4. In fact, Duffy did erase the messages. Tr. 371. With CAP, Diamantis solicited Roy for money

to make a supposed "donation," even though he provided Roy no documentation and Roy did not actually believe that was what he was doing with the money. Tr. 414–15, 446.

B. Adequate Deterrence and Protection of the Public

It seems unlikely—but not impossible—that Diamantis poses a substantial risk to reoffend. At a minimum, his conviction here and the attendant publicity surrounding his criminal activity will almost certainly deter any agency, public or private, from giving Diamantis discretionary authority over large sums of money.

That said, Diamantis's continued insistence, in the face of overwhelming documentary evidence to the contrary, that he has done nothing wrong points to a serious flaw in his own moral and ethical calculus, which merits significant consideration by the Court. Diamantis first gave his denials in the three law enforcement interviews that were the subject of the false statements counts, in which he denied any influence over the award of school construction contracts or having accepted any money from a contractor to use his influence. PSR ¶ 49. Then, at trial, he repeated those denials, even when confronted directly with the contradictory evidence. PSR ¶ 56. Even now, in anticipation of sentencing, Diamantis has offered no acknowledgment of responsibility for his crimes. While entitled to go to trial and put the Government to its proof, Diamantis's decision to offered brazenly false testimony to the Court and the jury strongly suggests a profound lack of remorse, making it difficult to believe that he would not offend again if presented with the opportunity.

Even if specific deterrence is not a significant consideration, the Court should also strongly consider general deterrence. Crimes by public officials are particularly susceptible to general deterrence because "[b]ribery is a premeditated crime—those tempted to sell out the public have plenty of time to weigh the risks and rewards before doing so." *United States v. Arroyo*, 75 F.4th

705, 709 (7th Cir. 2023). A Guidelines sentence sends an important message to another public official tempted to use their office for personal gain, namely, that the consequences will not just be the loss of office and reputation, but substantial loss of liberty as well. A non-custodial sentence for a corrupt public official, on the other hand, sends the exact opposite message. *See United States v. Morgan*, 635 F. App'x 423, 450 (10th Cir. 2015) ("Properly considering general deterrence, we fail to see how a non-custodial sentence would deter public officials from soliciting bribes."). Indeed, considering the calculus of a rational public official, "[g]eneral deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionately minimized." *Id*. If anything, as the PSR and Diamantis acknowledge, the proposed Guidelines calculation is conservative, Def. Mem. at 4, and likely underrepresents the seriousness of these crimes.

C. <u>History and Characteristics of the Defendant</u>

In his sentencing memorandum, Diamantis devotes a large part of his argument to his personal circumstances, including prior public service, Def. Mem. at 7, collateral consequences of his conviction, including his alleged indigency, Def. Mem. at 7–8, and his age and "lack of physical dangerousness," Def. Mem. at 7, 9. The Government agrees that the Court should consider these factors in reaching the appropriate sentence. However, it is less obvious that they explain Diamantis's conduct or eliminate the need for a substantial prison sentence.

*First*, nothing about Diamantis's history of public service necessarily points towards a more lenient sentence for having engaged in a three-year scheme to exploit government office for personal gain. While he refers to himself as a "military veteran," Def. Mem. at 7, the PSR clarifies that Diamantis served less than a month in Officer Candidate School before being honorably discharged due to a knee injury. PSR ¶ 153. Diamantis served in various state offices, including

as a state legislator for more than a decade, in addition to maintaining a private law practice at times, PSR ¶¶ 142–50, and self-reports various volunteer activities, PSR ¶ 152. Neither his memorandum nor the PSR set out with any specificity the precise good works as a legislator or bureaucrat that Diamantis believes counteracts the seriousness of his betrayal of his office and the taxpayers. If anything, his long history of service suggests that Diamantis was acutely aware of his obligation as a public official to serve the citizens, making his crime all the more willful.

*Second*, the collateral consequences of Diamantis's conviction—including loss of reputation and career, financial difficulties, and diminished future earning potential, Def. Mem. at 8—are all of his own making and attach to this defendant no differently from any other public official who makes similarly predatory choices. *C.f. Koon v. United States*, 518 U.S. 81, 110 (1996) (in evaluating departure in a civil rights prosecution, holding "we must conclude it is not unusual for a public official who is convicted of using his governmental authority to violate a person's rights to lose his or her job and to be barred from future work in that field. Indeed, many public employees are subject to termination and are prevented from obtaining future government employment following conviction of a serious crime, whether or not the crime relates to their employment."). Moreover, many of these consequences would have existed for Diamantis regardless of this conviction; his removal from state service long preceded his arrest and conviction. His financial difficulties were as much a motive for his criminal conduct as they were a consequence, as Diamantis complained repeatedly about his financial obligations to justify seeking money from Duffy and Monarca. *See* GX 21B ("I had to eliminate Juliana's tuition account and not pay the last payment on the wedding."), GX 28 ("Just approved 60k in change orders weaver for you guys. Plus rain labor. And I can't pay my mortgage. Due today."). Those financial difficulties, in turn, appear to be a function of Diamantis's own lifestyle choices. For

example, rather than put his daughter in a public school, Diamantis solicited money from state contactors to fund her private school education. *See* GX 56; *see also* GX 21B (reference to daughter's tuition account). Indeed, Diamantis was well paid as the OSCGR administrator and deputy secretary of OPM, certainly sufficient to live comfortably under normal circumstances and without resort to corrupt deals. And regular travel to Greece, along with repeated requests throughout the course of this case to travel to Greece with family for as long as six weeks, belie Diamantis's current claims of destitution. Doc. 25, 49, 52, 54, 57.

*Third*, Diamantis's claim that his age (70) and "lack of physical dangerousness" warrant a non-custodial sentence ring hollow under these circumstances. This defendant is hardly "elderly," as he claims, and he reports no substantial medical issues that might otherwise counsel against prison time. The Court can make its own observations, but Diamantis certainly appeared energetically engaged in his own defense, and betrayed no frailty either in the courtroom or during periodic comments to the media before, during, and after the trial. Moreover, Diamantis's lack of physical dangerousness is entirely irrelevant—he is being punished for his assault on good government, which standing alone warrants substantial penalty.

IV. Additional Responses to Defense Arguments

In addition to his personal history and circumstances, as discussed above, Diamantis's memorandum otherwise focuses on the sufficiency of alternatives to incarceration, such as "home detention [and] restrictions on employment" that he claims would "publicly mark the seriousness of the offenses while permitting Mr. Diamantis to remain responsible for his basic needs and lawful obligations." Def. Mem. at 8; *see also* Def. Mem. at 11. But, as discussed above, a non-custodial sentence, or even a sentence below the Guidelines, would undermine the rule of law and the seriousness with which the courts and the public should view Diamantis's breach of public trust.

While Diamantis laments the length of sentence suggested by the Guidelines calculation, even that range likely understates the seriousness of his crime. The proposed calculation applies U.S.S.G. § 2C1.1(b)(2) and uses the lesser figure of amount of the bribes paid to Diamantis rather than the potentially larger value of the benefit received from Diamantis. While the value of the benefit received by Acranom and CAP is likely far greater than the value of their bribe payments, the Government lacks sufficiently specific information to advance the use of that larger figure. See U.S.S.G. § 2C1.1(b)(2) (referring to the "value of the payment, the benefit received or to be received in return for the payment"). Acranom received a $3,034,000 contract for Weaver Phase 4 (GX 124), a $2,880,445 contract for the Birch Grove Project (GX 309), and a $300,000 payout for settling the claim on Weaver Phase 2 (GX 148). CAP received $530,000 in contracts for the Birch Grove Project (GX 305; GX 307), a $1,769,050 contract for the Bulkeley Project (GX 524), and a $65,620 owner's representation agreement with New Britain (GX 414). CAP also received a contract with New Britain for $115 per hour for its help closing out school construction projects (GX 402), although the Government does not know how many hours were paid under that contract. In total, then, Acranom and CAP received at least $8,579,115 in contracts as a result of Diamantis's corrupt influence. However, the Government has not been able to obtain reliable information to determine the gross profit margin on these contracts. See U.S.S.G. § 2C1.1 cmt. n.3 ("The value of 'the benefit received or to be received' means the net value of such benefit."); *United States v. Landers*, 68 F.3d 882, 885 (5th Cir. 1995) (defining "net value" as "gross profit," that is, without deducting indirect costs); *c.f.*, *United States v. Glick*, 142 F.3d 520, 525 (2d Cir. 1998) (defining net value as gross profit in analogous § 2E5.1 guideline for bribery in relation to employee welfare or pension benefit plans). Gross margin in the commercial masonry business can be as much as 25–40%. *See* Construction Profit Margins by Trade, October 31, 2025, Projul, available at

https://projul.com/blog/construction-profit-margins-guide/ (last accessed September 10, 2026). Even if gross profits were only 10%, the value of the improper benefit would be approximately $857,911, which would result in a 14-point enhancement rather than the eight points the PSR suggests Diamantis should receive. While the Government is not advocating use of an alternative calculation, in assessing the § 3553(a) factors, the Court may wish to consider that the Guidelines could—and likely ought to be—substantially higher.

In any event, because the Government and PSR employ the most conservative possible Guidelines loss calculation, Diamantis's critique that the Guidelines overemphasize loss falls flat. *See United States v. Corsey*, 723 F.3d 366, 377 (2d Cir. 2013) (Underhill, J. concurring). Instead, the Guidelines range here evenly reflects each of the aggravators, in addition to the size of the bribes and the benefits delivered, that make Diamantis's crimes so serious—he is a public official, he took many bribes, he was in a high-level decision-making position, he was the organizer of two different corrupt schemes, and he lied and obstructed the investigation into his conduct.

V. Conclusion

For the reasons stated above, the Government urges the Court to sentence Diamantis to a Guidelines term of imprisonment commensurate with the seriousness of his crime.

Respectfully submitted,

DAVID E. NOVICK
Attorney for the United States, Acting under Authority Conferred by 28 U.S.C. § 515

/s/

JONATHAN N. FRANCIS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv05083
jonathan.francis@usdoj.gov
157 Church Street, 25th Floor
New Haven, CT 06510
Tel.: (203) 821-3700

CERTIFICATE OF SERVICE

This is to certify that on September 10, 2026, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/

________________________________________
DAVID E. NOVICK
ASSISTANT UNITED STATES ATTORNEY